**YALE UNIVERSITY, Appellant,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE, DOMESTIC AND INTERNATIONAL BUSINESS ADMINISTRATION, OFFICE OF IMPORT PROGRAMS, Appellee.**

**BROWN UNIVERSITY, Appellant,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE, DOMESTIC AND INTERNATIONAL BUSINESS ADMINISTRATION, OFFICE OF IMPORT PROGRAMS, Appellee.**

**Appeal Nos. 76–18, 76–30.**

United States Court of Customs
and Patent Appeals.

Dec. 1, 1977.

Jose A. Cabranes, Legal Adviser and Director of Gov't Relations, John B. Latella, Asst. Legal Adviser, New Haven, Conn., attorneys of record, for Yale University, appellant.

Mark A. Pfeiffer, Tillinghast, Collins & Graham, Providence, R. I., attys. of record, for Brown University, appellant.

Barbara Allen Babcock, Asst. Atty. Gen., William Kanter, Mary Gallagher, Washington, D. C., attys. of record, for Dept. of Justice, Civil Division, Appellant Section, appellee.

Eleanor D. Acheson, Ropes & Gray, Boston, Mass., attys. of record, for Harvard University, amicus curiae.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and SCOVEL RICHARDSON, Associate Judge, United States Customs Court.

BALDWIN, Judge.

This is an appeal pursuant to 28 U.S.C. § 1544 [1] from separate decisions of the Sec-

---

1. 28 U.S.C. § 1544 provides:

    The Court of Customs and Patent Appeals shall have jurisdiction to review, by appeal on questions of law only, findings of the Secretary of Commerce under headnote 6 to schedule 8, part 4, of the Tariff Schedules of

retary of Commerce denying a duty exemption for scientific equipment purchased and imported by appellants. The two cases are consolidated as both present identical questions of law from essentially the same fact patterns. The statutory authority for the duty exemption is the Educational, Scientific, and Cultural Materials Importation Act of 1966 (Importation Act of 1966)[2] which provides in part:

> Articles entered for the use of any nonprofit institution, whether public or private, established for educational or scientific purposes:
>
>> Instruments and apparatus, if no instrument or apparatus of *equivalent scientific value* for the purposes for which the instrument or apparatus is intended to be used is being manufactured in the United States (see headnote 6 to this part). [19 U.S.C. § 1202, Schedule 8, Part 4, Item 851.60, of the Tariff Schedules of the United States (TSUS). Emphasis ours.]

This act further provides that the Secretary of Commerce shall have responsibility for determining "equivalent scientific value," and shall consider the written advice of the Secretary of Health, Education, and Welfare.

Regulations 15 CFR 301, *et seq.*, provide definitions and procedures for completing an application to effectuate the above duty exemption. Regulation 301.1(a) provides, in part:

[The exemption shall be given] if the Secretary of Commerce determines that no instrument or apparatus of *equivalent scientific value* to such article, *for the purposes* for which the instrument of [sic] apparatus is *intended to be used, is being manufactured in the United States.* The responsibilities of the Secretary of Commerce under the Act have been delegated to the Assistant Secretary for Domestic and International Business of the Department of Commerce, with power of redelegation, by Department of Commerce Organization Order 10–3 of July 5, 1974, who has redelegated these responsibilities to the Deputy Assistant Secretary for Resources and Trade Assistance by Domestic and International Business Administration Organization and Function Order 44–1, effective November 17, 1972. [15 CFR 301.1(a). Emphasis ours.]

The Secretary of Commerce has delegated his authority over this matter, through the above regulation and an order (38 Fed. Reg. 9,324 (1973)), to the Director of the Office of Import Programs. The decisions on appellants' applications were made within the Office of Import Programs by the Director of the Special Import Programs Division (Director). The Director denied the applications now pending before the court, reasoning, that appellants had not established "pertinent specifications" as defined in 15 CFR 301.2(n).[3]

---

the United States (relating to importation of instruments or apparatus).

2. 19 U.S.C. § 1202, Schedule 8, Part 4, Item 851.60. We note that the enactment of the Importation Act of 1966 was a condition for the United States to become party to the Agreement on the Importation of Educational, Scientific, and Cultural Materials (known as the Florence agreement). The object of the agreement was to expedite the free flow of educational, scientific, and cultural materials by permitting a duty exemption. 1966 U.S.Code Cong. & Admin.News, p. 3254.

3. 15 CFR 301.2(n) provides:
    "Pertinent specifications" of an instrument, apparatus, or accessory means those structural, operational, performance, and other characteristics specified for the instrument, apparatus, or accessory that are necessary for the accomplishment of the purposes described by the applicant in response to question 7 of the application form, excluding from consideration those purposes excluded by headnotes 1 or 6(a) to Part 4 of Schedule 8. The term does not extend to such characteristics as size, durability, complexity, ease of operation, ease of maintenance and versatility, unless the applicant can demonstrate that they are necessary for accomplishing the purposes for which the article is intended to be used. The term does not include cost differences between the domestic and foreign instrument, apparatus or accessory.

## Statement of Facts

Appellants, Yale University (Yale) and Brown University (Brown), are nonprofit institutions established for educational and scientific purposes. In furtherance of these goals, both institutions conduct scientific training and research programs which require suitable scientific equipment. Each institution imported an electron microscope and attempted to gain a duty exemption for the equipment pursuant to the Importation Act of 1966.

## Yale Application

On August 22, 1974, Yale's Professor Joel Rosenbaum of the Biology Department completed and submitted to the Director of the Special Import Programs Division a "Request for Duty-Free Entry of Scientific Instruments or Apparatus," Form OIPF–768 for an electron microscope. It was the stated intention of the university to use the equipment to train graduate students and researchers and to perform bio-medical research. He enumerated specific characteristics of the equipment which he decided were significant to carry out the intended uses and were "pertinent specifications." The application, in accordance with applicable regulations, compared these specific characteristics of the EMU–4C electron microscope (EMU–4C) which was produced domestically by Adam-David Company with the imported EM–201C electron microscope (EM–201C). Appellant alleged in the application that the domestically produced EMU–4C was not scientifically equivalent to the imported EM–201C for the intended uses which require a certain resolving power[4] and stability of performance. Notice of the application was published in the Federal Register on September 19, 1974.[5] The Director requested on October 9, 1974, a recommendation from the Secretary of the Florence Agreement Committee (Florence Committee) of the National Institutes of Health (NIH) of the Department of Health, Education and Welfare (HEW). On November 21, 1974, in compliance with the request, the Florence Committee notified the Director of its recommendation.[6] On December 10, 1974, Yale's application was denied without prejudice to resubmit. Accompanied by additional information,[7] Yale's application was resubmitted on March 4, 1975. The same procedures were followed for reconsideration.[8] A decision was issued on March 19, 1976, denying Yale's reapplication.[9] The underlying rea-

---

4. The EMU–4C could attain a 5Å point to point resolution. The first specifications submitted for EM–201C had a guaranteed 5Å point to point resolution which was corrected by a handwritten change to a 3Å point to point resolution. Additional information filed with Yale's reapplication included the printed revision of EM–201C specifications. Note 7, *infra*.

5. 39 Fed.Reg. 33,720 (1974).

6. The Florence Committee made the following comments:
   Both the EM 201 and EMU–4C guarantee 5Å point to point resolution, have similar accelerating voltages and magnification ranges. *Acceptance test micrographs showing 3Å point to point resolution are not included in the application.* Opinions on "down time", reliability, manufacturer's reputation, etc., are not relevant to duty-free entry.

7. The *additional information* included (1) a revised brochure for EM–201C with updated specifications which include a *guaranteed 4Å point to point resolution,* (2) a letter from the domestic supplier of the EM–201C explaining the handwritten change of the resolving power in the first specifications, and (3) three notarized electron micrographs showing the revised guaranteed resolution.

8. Notice published in the Federal Register on April 15, 1975. 40 Fed.Reg. 16,686 (1975).

9. The Florence Committee made the following comments:
   The use is research oriented with the teaching use at a sophisticated level, therefore simplicity is not pertinent and the EMU–4C is the competing domestic instrument * *. The article has 4Å point resolution guarantee, or 3.4Å lattice guarantee * * * that was frequently demonstrated. This degree of resolution does not represent a scientifically significant difference from the 5Å point to

son for the denial was that the intended use did not establish "pertinent specifications" which would support the duty-free entry.

### Brown Application

On October 15, 1974, Brown submitted to the Director of the Special Import Programs Division Form OIPF–768 "Request for Duty-Free Entry of Scientific Instruments or Apparatus" for EM–201C. Dr. Richard A. Ellis, who prepared the application, explained therein that the instrument would be used to train students from undergraduate level to research level and to perform research ranging from study of three dimensional structure of immunoglobulins to crystalloid inclusions of reproductive cells. He compared the imported EM–201C with the domestically produced EMU–4C to show nonequivalent scientific value. Dr. Ellis listed a number of factors for comparison which essentially are resolving power and convenience of performance. Following publication in the Federal Register,[10]

the Director, on December 4, 1974, requested a recommendation from the Secretary of the Florence Committee.[11] On March 18, 1975, the Director notified Brown of the denial without prejudice to resubmit. The memorandum reiterated the Secretary's comments. Brown resubmitted the application with additional evidence.[12] The same procedures were followed uniformly with the first application.[13] Again, pursuant to a request from the Director, the Secretary evaluated the application. On behalf of the Florence Committee, the Secretary stated that the application did not establish "pertinent specifications" to justify a duty-free entry.[14] Finally on June 14, 1976, the Director notified Brown of the denial and, by memorandum, adopted the Florence Committee's recommendation.

### OPINION

Appellants base, in part, their appeal on section 10(e) of the Administrative Proce-

---

point resolution guarantee of the EMU–4C for the work. The EMU–4C has equivalent accelerating voltages, magnification range, etc. Operation out of specification limits or other forms of down time are cost-related, therefore not pertinent. The EMU–4C has scientific equivalence for the planned work.

**10.** 39 Fed.Reg. 40,182 (1974).

**11.** Mr. Nelson Alexander, Secretary of the Florence Committee, made the following comments on behalf of the committee:

The domestic EMU–4C has a guaranteed point to point resolution of 5 angstroms while the article now guarantees of angstrom point resolution (3.5 lattice), they have similar magnifications and accelerating voltages. The differences are not scientifically significant. Frequency and duration of down time is cost related and can not be considered. Item 5 and the purchase order do not show the goniometer stage to have been ordered, therefore irrelevant.

**12.** The additional information included (1) a revised brochure for the EM–201C with updated specifications which included a *guaranteed 4Å point to point resolution,* and (2) a letter from the domestic supplier of the EM–201C stating that the instrument purchased by Brown was an advanced model and explaining

the handwritten change of the resolution in the original specifications.

**13.** Notice was published in the Federal Register on May 8, 1975. 40 Fed.Reg. 20,122 (1975).

**14.** Again, speaking for the Florence Committee, Secretary Nelson Alexander stated:

The EMU–4C is the competing domestic instrument. Its 5Å point to point resolution guarantee is not significantly different for the work, from the 4Å point guarantee for the article. The 3.5Å lattice or 2.5Å attainable are from diffraction patterns and too poorly defined to be pertinent. The specifications for the EM 201C have not been found to be understated. Down-time projections, ruggedness, convenience for the operator, solid state electronic design and floor space requirements are all cost related or convenience features that fail to be pertinent. The goniometer stage can not be considered since it was not ordered. The EMU–4C and EM 201C have equivalent accelerating voltages and photographic capabilities. Dark field microscopy by objective aperture shift or beam tilting is possible with the EMU–4C; it is also a nonpertinent convenience. Degree of contamination control, pumping automation and skill needed for beam alignment are not pertinent, being conveniences.

dure Act (APA),[15] for the Director's abuse of discretion which they argue is evidenced by (1) the Director following a procedure which failed to provide appellants an opportunity to rebut adverse comments and by (2) the Director's reliance on the recommendations of the Florence Committee, which is not in compliance with section 3 of the APA.[16]

Firstly, regarding right to rebuttal, both appellants argue that the Director relied solely on the Florence Committee's memoranda to reach each determination of equivalent scientific value. Appellants argue that the only other evidence of nonequivalence of scientific value on record was in appellants' applications. Appellants were aware that HEW would be consulted with regard to the applications. They were not aware that the Florence Committee would be consulted or what the substance of the evaluations was until they received the Director's denials. Appellants contend that they had no opportunity before each denial to respond to the adverse comments of the committee.

■ The record shows that appellants did have an opportunity to present facts and to respond to adverse recommendations. The first denial in each case was *without prejudice* which gave each appellant an opportunity to resubmit. The Director made suggestions for refiling and included copies of the recommendations made by the Florence Committee for guidance. The record clearly indicates that appellants had an opportunity to strengthen their applications after considering the adverse comments. Appellants have cited no case law which directly supports their position on the legal issue of abuse of discretion by the Director.[17]

Secondly, appellants argue that the Director's decision was "arbitrary and capricious" due to unrestrained reliance on the Florence Committee's recommendations. They argue that to adopt advice of a governmental body not complying with the APA invokes section 10(e) of the APA.[18] Appellants argue that the Department of Commerce is only a "rubber stamp" for the recommendation of the Florence Committee.

■ We treat this argument in two parts; the first discussion traces the line of authority from the Secretary of Commerce to the Florence Committee, and the second discussion centers on the Director's decisions to deny the applications. The Secretary of Commerce, pursuant to the Importation Act of 1966,[19] has the responsibility to make the determination of scientific nonequivalency which justifies the exemption. This responsibility has been delegated to the Director of the Office of Import Programs. The Importation Act of 1966 expressly permits the Secretary of Commerce

---

**15.** 5 U.S.C. § 706. It provides, in part, that the reviewing court:

    \*    \*    \*    \*    \*    \*

    (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law \* \* \*.

**16.** 5 U.S.C. § 552. This section requires that a nonexempt federal agency make available to the public, either through the *Federal Register* or otherwise, a description of the organization, policies, etc. Appellants found no such description.

**17.** Appellants cite *Greater Boston Television v. F. C. C.,* 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971), for an analogous proposition of law which would be instructive had the appellants been denied an opportunity to respond to adverse comments. In *Greater Bos-*

*ton,* the court held that an agency is obligated to follow precedent and that if it chooses to change, it must explain why. We note that the fact pattern of *Greater Boston* involves a licensing procedure not found in the cases presently before the court. Appellants also cite *United States v. International Harvester Co.,* 387 F.Supp. 1338 (D.D.C.1974), in which the court held that where formal administrative hearings are neither requested nor provided for (by statute) the court is limited to a review of the record to determine whether the agency finding was "arbitrary or capricious." Section 10(e) Administrative Procedure Act, 5 U.S.C. § 706.

**18.** See notes 15 and 16, supra, and accompanying text.

**19.** 19 U.S.C. § 1202, Schedule 8, Part 4, headnote 6(c).

to consider advice from the Secretary of HEW. The Florence Committee is part of NIH, and NIH is a part of HEW. The same statute also affords interested parties and other government agencies an opportunity to present their views. In absence of a clear showing otherwise, we conclude that the advice which is given by the Florence Committee pursuant to a request from the Director of the Special Import Programs Division is within the framework of the law.

With regard to Yale's application, the first denial was made *without prejudice to resubmit.* In the decision, the Director set out, in general, the pertinent statutory authority and explained that a decision to grant an exemption is based on the existence of nonequivalent characteristics between the domestic and foreign equipment and on a showing that at least one of the characteristics is pertinent to one or more of the purposes for which the equipment would be used. The Director further cited the recommendation made by the Florence Committee on behalf of HEW and suggested how Yale could reinforce the application. He suggested that an explanation be given for the pen and ink change of 5Å specification to 3Å. Lastly, the Director attached material for reapplication.

Reviewing the second denial of Yale's application, we note that the Director commented on all the evidence presented, including the evidence presented by the domestic producer, Adam-David Company, who was adversely affected by the loss of domestic business to the foreign producer. With regard to pertinency of resolving power, the Director discussed comments by the Adam-David Company along with the recommendation of the Florence Committee. With respect to features of stability, convenience of operation, and reliability, the Director also discussed respective comments made by the Adam-David Company and by the Florence Committee. The Director concluded that the features were not pertinent specifications.

With regard to Brown's application, the Director made the same review of the evidence. The first denial which was made *without prejudice to resubmit* was of a similar format as in the Yale fact pattern. The Director set out pertinent authority and explained, in general terms, that a determination of scientific nonequivalency depends on the structural, operational, and/or performance characteristics which are not possessed by the most closely comparable domestic equipment and on a showing that at least one of these characteristics is pertinent to one or more of the purposes for which the equipment is to be used. The Director cited the recommendation made by the Florence Committee and suggested that the applicant, Brown, reinforce the application using the HEW comments as a guide. The Director further suggested that an explanation be given for the pen and ink change on the printed foreign equipment specifications from a guaranteed resolution of 5Å to 3.5Å. Lastly, the Director enclosed material for reapplication. In the denial of the reapplication, the Director discussed the intended use, the persons who would use the equipment, and the specifications.

■ We conclude from the above discussion that the Director employed procedures within the letter of the law. Our inquiry, however, does not stop with this conclusion. Appellants further argue that, as a matter of law, the decision made by the Director is not supported by substantial evidence.

The legal question on the merits of the Yale and Brown cases has two levels of inquiry. The initial inquiry is whether the facts set forth pertinent specifications and the ultimate inquiry is whether the imported equipment is scientifically equivalent to the domestic equipment. The facts in these cases are undisputed. It is the legal conclusion arising from the facts which is in dispute. Our review of this legal conclusion measures the Director's decision against the standard set out in *Varian Associates v. United States,* 56 C.C.P.A. 54, C.A.D. 953 (1969). This standard requires that the Di-

rector provide some scientific evidence as a basis for his decision. A conclusory statement, merely opinion, by the Florence Committee will not suffice.[20] Without scientific evidence, an applicant does not have a meaningful opportunity for rebuttal.

■ There is no statutory requirement for a formal hearing to obtain the educational exemption being considered here. The request is made by application which is considered by the Commerce Department. The agency is not required to compile a formal record. Acknowledging that expertise of a specific nature is lodged in the Commerce Department and that Congress, through the Importation Act of 1966, gave a measure of discretion to this agency to grant the educational exemption, we will not substitute our judgment for that of the agency on matters which involve expertise of a specific nature. We consider the appeal before us not as scientists, but as jurists, with the authority to review questions of law.[21]

■ Analyzing the decision in both the Yale and Brown cases, we note that the Director summarily adopted the recommendations given by the Florence Committee.[22] In both cases, the recommendation is but a conclusion that the particular specifications in question are not pertinent and that the scientific equipment is scientifically equivalent for the intended purposes. To merely refer to the Florence Committee recommendations, as they exist in this case, is not enough. The recommendations themselves do not present any discussion of the evidence which supports the conclusory statements therein.

In conclusion, we do not find, in either of the Director's decisions, that he based his decisions upon the evidence in the record. For this reason, we *reverse.*

---

20. For example, the guaranteed resolution is 5Å for the domestic equipment and 4Å for the foreign equipment. There is admittedly a difference in these measurements. However, it is not clear from the decision why this difference is not sufficient to support the exemption.

21. For example, whether a particular characteristic is a "pertinent specification" under 15 CFR 301.2(n) to be considered by the Commerce Department in determining the issue of "equivalent scientific value."

