**ASG INDUSTRIES, INC., PPG Industries, Inc., Libbey-Owens-Ford Company, and C E Glass, Appellants,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 79–15.**

United States Court of Customs and Patent Appeals.

Nov. 29, 1979.

Rehearing Denied Feb. 21, 1980.

---

Frederick L. Ikenson, Eugene L. Stewart, Washington, D. C., attorneys of record, for appellants.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Director, Joseph I. Liebman, John J. Mahon, Sidney N. Weiss, New York City, for the U. S.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and PENN,* Judges.

MILLER, Judge.

This is an appeal from the judgment of the United States Customs Court, 82 Cust.Ct. ——, C.D. 4782 (1979), which upheld the decision of the Secretary of the Treasury ("Secretary") that float glass manufactured in West Germany did not benefit from the payment or bestowal of a bounty or grant within the meaning of section 303 of the Tariff Act of 1930, as amended (19 U.S.C. § 1303). We reverse and remand.

*Background*

Appellants, domestic manufacturers and wholesalers of float glass, petitioned the Commissioner of Customs for imposition of a countervailing duty on float glass manufactured in West Germany. They alleged that benefits received by float glass manufacturers in West Germany under various regional development programs, which included low-interest loans and investment subsidies in the form of cash grants and tax credits, were bounties or grants within the countervailing duty law.[1]

The Treasury Department ("Treasury") preliminarily determined[2] that imports of float glass from West Germany benefit from the payment or bestowal of a bounty or grant within the meaning of 19 U.S.C. § 1303 by reason of the payments made under the regional development programs. After further study based on additional information, Treasury changed its position[3] giving the following reasons:

> The German Government has advised the Treasury Department that these benefits have the effect of offsetting disadvantages which would discourage industry from moving to and expanding in less prosperous regions. Inasmuch as the recipient glass producers sell a preponderance of their production in the West German home market (not less than 80 percent and up to 99%), the level of exports to the United States is a small percentage of the amount exported, and the amount of assistance provided by the regional incentive programs is less than 2 percent of the value of float glass produced, these benefits are not regarded as bounties or grants within the meaning of section 303 of the Tariff Act of 1930, as amended (19 U.S.C. § 1303).

Appellants then brought an action in the Customs Court, under 19 U.S.C. § 1516(d),[4]

---

* The Honorable John G. Penn, United States District Court for the District of Columbia, sitting by designation.

1. 19 U.S.C. § 1303(a) [section 303(a), Tariff Act of 1930, as amended] provides in relevant part:
 § 1303. Countervailing duties—Levy of countervailing duties
 (a)(1) Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such

cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

. . . . .

(5) The Secretary shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated.

2. In "Notice of Preliminary Countervailing Duty Determination," published in 40 Fed.Reg. 27499 (1975).

3. In "Notice of Final Countervailing Duty Determination," published in 41 Fed.Reg. 1300 (1976). This notice and the preliminary notice (note 2 *supra*) were signed by the Commissioner of Customs and by the Assistant Secretary of the Treasury (for Enforcement Operations and Tariff Affairs).

4. 19 U.S.C. § 1516(d) provides as follows:
 (d) Within 30 days after a determination by the Secretary—

contesting this negative countervailing duty determination. Both sides moved for summary judgment. Appellants alleged that the payments are countervailable; the Government contended that appellants failed to establish that the alleged bounties or grants possess the requisite effect upon international trade that is necessary before countervailing duties will be imposed.[5]

*The Customs Court*

The Customs Court concluded that, although the statutory language is mandatory ("there *shall* be levied"), Congress did not intend "that all assistance given by foreign governments" be considered bounties or grants within the statute, but gave authority to the Secretary to determine whether a bounty or grant has been bestowed, citing *United States v. Hammond Lead Products, Inc.*, 58 CCPA 129, C.A.D. 1017, 440 F.2d 1024, *cert. denied*, 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971). It said that the case law provides two tests to be used in countervailing duty determinations: (1) Whether, as a result of governmental programs, exportation of the involved merchandise is encouraged, citing *Downs v. United States*, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903) (hereinafter "*Downs*"), and *Nicholas & Co. v. United States*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919) (hereinafter "*Nicholas*"); (2) whether the governmental assistance distorts international trade or discriminates against United States sales at home and

(1) under section 160 of this title, that a class or kind of foreign merchandise is not being, nor likely to be sold in the United States at less than its fair value, or

(2) under section 1303 of this title that a bounty or grant is not being paid or bestowed,

an American manufacturer, producer, or wholesaler of merchandise of the same class or kind as that described in such determination may file with the Secretary a written notice of a desire to contest such determination. Upon receipt of such notice the Secretary shall cause publication to be made thereof and of such manufacturer's, producer's, or wholesaler's desire to contest the determination. Within 30 days after such publication, such manufacturer, producer, or wholesaler may commence an action in the United States Customs Court contesting such determination.

abroad, citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978), *aff'g United States v. Zenith Radio Corp.*, 64 CCPA 130, C.A.D. 1195, 562 F.2d 1209 (1977).[6] Because only up to 20 percent of the float glass manufactured by the participants in the regional development programs was sold outside the West German home market, and because the ad valorem size of the assistance provided by these programs was less than 2 percent of the value of the float glass produced, the Customs court found that, although such assistance was more than *de minimis*, "the *bounties* do not appear to have induced the sale of merchandise in such quantities or value *as would tend to distort international trade*." (Emphasis added.) The Customs Court cited trade statistics showing increases in the United States production and exports (especially to West Germany) of float glass, and decreases in importations of West German float glass, for support of the Secretary's decision to not impose countervailing duties. Having determined that appellants "failed to overcome the presumption of correctness attaching to the action of the Secretary,"[7] the Customs Court denied appellants' motion and granted the Government's motion for summary judgment.

### OPINION

Essentially, appellants argue that, since the countervailing duty statute is mandato-

5. The Government concedes that the *amount of the benefits* received by the foreign manufacturers under the regional development programs is not *de minimis*.

6. We find no support whatsoever in *Zenith* for a trade distortion test. The Supreme Court did not use the phrase "trade distortion" in its opinion, and the presence or absence of such a factor was not relied upon as a basis for its decision.

7. 28 U.S.C. § 2635(a) provides:

In any matter in the Customs Court:

(a) The decision of the Secretary of the Treasury, or his delegate, is presumed to be correct. The burden to prove otherwise shall rest upon the party challenging a decision.

ry, once the Secretary has determined that foreign manufacturers are receiving any benefit from their government, a countervailing duty must be imposed. The Government, agreeing with the Customs Court, argues that the legislative history and case law show that Congress intended countervailing duties to be imposed only against those programs and actions of a foreign government that have been shown to distort international trade and that the following factors involved in international trade distortion must be considered in determining the existence of a bounty or grant: (1) the ad valorem size of the benefits; (2) the level of exports from the foreign country of goods receiving the benefits; and (3) whether the benefit programs had a positive effect on these exports.

With respect to the ad valorem size of the benefits, the Government's concession that the benefits under the regional development programs are not *de minimis* establishes, prima facie, that this factor is met. The finding by Treasury that up to 20 percent of the goods are exported likewise establishes that the second factor is met.[8] As to whether the benefit programs had a positive effect on exports, Treasury's finding that "the amount of assistance provided by the regional incentive programs is less than 2 percent of the value of float glass produced" does not, without more, overcome a presumption that such benefits had a positive effect, or would have a potentially positive effect, on exports, particularly when compared to the average ad valorem rate of duty of 8.2 per cent during the year involved (1974), as pointed out by appellant. *See* 42 Fed.Reg. 23146–47 (1977), where Treasury determined that "bounties or grants were being paid or bestowed, directly or indirectly on exports of certain fasteners [nuts, bolts, and cap screws] from Japan," the benefits being .20 percent ad valorem. It said that, ordinarily, benefits of this size might be considered *de minimis* in relation to the value of the merchandise, but that they were "significant" when compared to the regular duty rate (up to .75 percent on an ad valorem basis.) *See also* 42 Fed.Reg. 28531 (1977) (aggregate benefits of eight tenths of one percent under a preferential loan program were greater than *de minimis* and it was, therefore, determined that the involved goods received bounties or grants within the meaning of section 303 of the Tariff Act of 1930, as amended).

By section 331(a) of the Trade Act of 1974, Pub.L.No.93–618, 88 Stat. 1978 (1975), Congress amended section 303 of the Tariff Act of 1930. Under new section 303(d) (19 U.S.C. § 1303(d) (Supp. V 1975)),[9] which was

---

**8.** Treasury set forth no basis for its finding that "the level of exports to the United States is a small percentage of the amount exported."

**9.** 19 U.S.C. § 1303(d) (Supp. V 1975) reads as follows:

(d) *Temporary provision while negotiations are in progress.*

(1) It is the sense of the Congress that the President, to the extent practicable and consistent with United States interests, seek through negotiations the establishment of internationally agreed rules and procedures governing the use of subsidies (and other export incentives) and the application of countervailing duties.

(2) If, after seeking information and advice from such agencies as he may deem appropriate, the Secretary of the Treasury determines, at any time during the four-year period beginning on January 3, 1975, that—

(A) adequate steps have been taken to reduce substantially or eliminate during such period the adverse effect of a bounty or grant which he has determined is being paid or bestowed with respect to any article or merchandise;

(B) there is a reasonable prospect that, under section 2112 of this title, successful trade agreements will be entered into with foreign countries or instrumentalities providing for the reduction or elimination of barriers to or other distortions of international trade; and

(C) the imposition of the additional duty under this section with respect to such article or merchandise would be likely to seriously jeopardize the satisfactory completion of such negotiations;

the imposition of the additional duty under this section with respect to such article or merchandise shall not be required during the remainder of such four-year period. This paragraph shall not apply with respect to any case involving non-rubber footwear pending on January 3, 1975, until and unless agreements which temporize imports of non-rubber footwear become effective.

added by this amendment, the Secretary could *waive imposition*[10] of a countervailing duty *if* : (1) steps were taken to reduce substantially or eliminate the adverse effect of the bounty or grant; (2) there was reasonable prospect of trade agreements reducing or eliminating barriers to, or other distortions of, international trade; *and* (3) imposition of a countervailing duty would be likely to seriously jeopardize the negotiation of such agreements. 19 U.S.C. § 1303(d)(2)(A)–(C).

During consideration of the bill (H.R. 10710) that became the Trade Act of 1974, it was made clear that all three conditions must be met before the Secretary could waive application of a countervailing duty, and it was emphasized that "either the bounty or grant or its adverse effect must be eliminated (or substantially reduced) before the Secretary would have authority to waive the imposition of a countervailing duty order during trade negotiations." It was explained that the amendments to the countervailing duty law "are designed to tighten the administration" of that law. S.Rep.No.93–1298, 93d Cong., 2d Sess. 185 and 187, *reprinted* in [1974] U.S. Code Cong. & Admin.News, pp. 7186, 7320 and 7322. To permit the Secretary to avoid using his waiver authority (and to avoid having to find that a more than *de minimis* bounty or grant or its adverse effect has been eliminated or substantially reduced) by simply finding that, for purposes of 19 U.S.C. § 1303, there is no bounty or grant through employment of a vague and "undefined" (to use the dissenting opinion's term) international trade distortion test would effectively frustrate the Congressional intent to *tighten* administration of the countervailing duty law.

> (3) The determination of the Secretary under paragraph (2) may be revoked by him, in his discretion, at any time, and any determination made under such paragraph shall be revoked whenever the basis supporting such determination no longer exists. The additional duty provided under this section shall apply with respect to any affected articles or merchandise entered, or withdrawn from warehouse, for consumption on or after the

Congress also made clear its understanding that "the present [countervailing duty] statute is mandatory in terms." H.R. Rep.No.93–571, 93d Cong., 1st Sess. 73 (1973). This demonstrates that, except for the waiver provision in the 1974 Act, the Secretary has not had any discretion to not impose a countervailing duty once it has been determined that a bounty or grant is being paid or bestowed. *American Express Co. v. United States*, 60 CCPA 86, 93, 472 F.2d 1050, 1056 (1973). Also, by including a requirement that the Secretary reach a final countervailing duty determination within one year of the filing of a petition (19 U.S.C. § 1303(a)(4)), Congress indicated its intent to put an end to Treasury Department practice calculated "to stretch out or even shelve countervailing duty investigations for reasons which have nothing to do with the clear and mandatory nature of the countervailing duty law." S.Rep.No.93–1298, *supra* at 183, *reprinted in* [1974] U.S. Code Cong. & Admin.News, *supra* at 7318. To permit the Secretary to place a narrow or restricted interpretation on "bounty" or "grant" as a basis for a negative countervailing duty determination would clearly frustrate the Congressional purpose of "assuring effective protection of domestic interests from foreign subsidies . . . ." *Id.* Further, it would be inconsistent with the broad meaning of "grant" long ago established by the Supreme Court in *Nicholas & Co. v. United States, supra* 249 U.S. at 39, 39 S.Ct. at 220:

> If the word "bounty" has a limited sense the word "grant" has not. A word of broader significance than "grant" could not have been used. Like its synonyms "give" and "bestow," it expresses a concession, the conferring of something by one person upon another.

> date of publication of any revocation under this subsection in the Federal Register.

**10.** The Secretary's authority to waive imposition of countervailing duties was extended to July 26, 1979 (date of enactment of the Trade Agreements Act of 1979, Pub.L.No.96–39), retroactive to January 3, 1979, when the previous waiver authority expired. Pub.L.No.96–6, 93 Stat. 10 (1979).

Despite a clear expression of Congressional intent that an injury test not be employed, the Secretary impliedly injected one into this case, finding that "the level of exports to the United States is a small percentage of the amount exported, and the amount of assistance . . . is less than 2 percent of the value of float glass produced . . . ."[11] The Senate-House Conference Report on H.R. 10710 declares that the waiver provision "is not to be construed as the intent of Congress [to] . . . inject an injury concept into countervailing duty cases regarding durable goods . . ." Conf.Rep.No.93–1644, 93d Cong., 2d Sess. 45, *reprinted in* [1974] U.S.Code Cong. & Admin.News, *supra* at 7390. Moreover, the Senate Report on H.R. 10710 states: "Section 303 of the 1930 Tariff Act does not provide for an injury test." S.Rep.No.93–1298, *supra* at 185, *reprinted in* [1974] U.S. Code Cong. & Admin.News, *supra* at 7320.[12]

Accordingly, we conclude that it was error to employ an injury (to United States trade) test in determining whether a bounty or grant was paid upon the manufacture or production of the involved merchandise. Also, we hold that, for purposes of the countervailing duty law, the benefits (as analyzed above) bestowed by West Germany upon float glass manufacturers under the regional development programs were bounties or grants.[13]

At the same time, it must also be pointed out that appellants' proposed test (any benefit, that is not *de minimis*, bestowed by a foreign government in connection with the production of merchandise requires a countervailing duty) ignores the clear wording of the statute. Once it has been determined that a bounty or grant is being paid or bestowed, 19 U.S.C. § 1303(a)(1) provides that "there shall be levied . . . a duty equal to the *net amount* of such bounty or grant." (Emphasis supplied.) Such language implies that certain deductions may be made from the actual payments to calculate the net bounty or grant and that all relevant circumstances are to be taken into account.[14]

We note that earlier court opinions have not been precise in distinguishing between "bounty or grant" and "net amount of each bounty or grant." Nevertheless, a difference has been implicit from the opinions. In *Zenith*, although the Supreme Court held that Japan was not conferring a bounty or grant, the Court actually determined that there was no net bounty or grant upon which countervailing duties could be imposed. The Court stated, 437 U.S. at 452–53, 98 S.Ct. at 2446, that:

> . . . the 1897 statute did provide for levying of duties equal to the *"net amount" of any export bounty or grant.* And the legislative history suggests that this language, in addition to establishing a responsive mechanism for determining the appropriate amount of countervailing duty, was intended to incorporate the prior rule that *non-excessive remission* of indirect taxes would not trigger the coun-

---

11. Although, as stated by the Customs Court, the test from *Downs* and *Nicholas* is whether foreign exportation is encouraged, we are dealing here with benefits paid upon "manufacture or production"; whereas, the statute involved in *Downs* and *Nicholas* provided for countervailing duties only on bounties or grants paid "upon exportation." Although one test for determining whether a bounty has been paid on *exportation* is whether exportation is encouraged, this is clearly not the only test that may be used in countervailing duty determinations, because the statute has been broadened to cover bounties paid upon manufacture and production as well as bounties paid upon exportation.

12. The United States, under a grandfather clause, is exempt from the injury requirement under the General Agreement on Tariffs and Trade.

13. The Customs Court said "it would appear that bounties or grants were bestowed on the production of float glass in the Federal Republic of Germany."

14. Congress reiterated this "net amount" concept in the legislative history of the extension of the waiver provision (note 9, *supra*):

> The countervailing duty, which is imposed in addition to regular duties, is equal to the *net amount* of the bounty or grant and is intended to offset the *advantage* afforded by the foreign subsidy practice. [Emphasis added.] S.Rep.No.96–45, 96th Cong., 1st Sess. 2, *reprinted in* [May 1979] U.S.Code Cong. & Admin.News, pp. ——, ——.

tervailing requirement at all. [Emphasis added.]

The Court clearly indicated that an *excessive* remission of tax would give rise to a bounty or grant.[15]

 Although the Secretary apparently made a feeble attempt to calculate the amount of the net bounty or grant involved here, the statement that "[t]he German Government has advised the Treasury Department that these benefits have the effect of offsetting disadvantages which would discourage industry from moving to and expanding in less prosperous regions" is totally inadequate. If a *factual basis* were shown for such an assertion, it might be concluded that no net bounty or grant was involved.[15.5] However, contrary to the dissenting opinion, the statement that Treasury was "advised" is hardly a factual basis supporting the conclusion that there was no bounty or grant. *See Yale University v. Department of Commerce*, 65 CCPA 97, 104, 579 F.2d 626, 632–33 (1977). Once it is established that a foreign manufacturer is receiving payments *such as those here involved* (*not* "every payment," as the dissenting opinion imagines) from its government, a countervailing duty *must*, absent a waiver by the Secretary, be imposed unless, in considering all circumstances surrounding the payment, certain deductions can be established resulting in no net benefit to that manufacturer. These deductions must be established by facts [16]—not by mere allegations of the foreign government or of the enterprises receiving the bounty or grant. Needless to say, without an adequate factual record, neither this court nor the Customs Court can perform a meaningful judicial review of countervailing duty determinations.

*Scope of Review*

 As this court pointed out in *United States v. Watson*, 603 F.2d 192, at 197 (1979), "There are no statutory provisions and no common law doctrines setting forth the nature or scope of the review of countervailing duty assessments in the Customs Court . . . ." Eschewing any expression of its views on the merits or propriety of a review *de novo* versus a review on the administrative record, this court said (at 197):

Congress having supplied no guidelines or criteria for determining what constitutes a "bounty" and what does not, having made no requirement that the Secretary hold a hearing or make a record for review, or that the Administrative Procedure Act be applied, and having provided no definition of the nature of the judicial review to be conducted in countervailing duty cases, "rational and substantial legal

---

**15.** In *Nicholas* the Court stated that cash payments made on exports were bounties or grants. Therefore, the Court equated the net bounty or grant with the actual bounty or grant. It rejected counsel's argument that the payments were intended to compensate the distillers for costs due to British excises and concluded that costs due to a foreign government's excises could not qualify as a deduction from a bounty or grant to calculate a net amount of the bounty or grant.

**15.5.** Section 771(6) of the Tariff Act of 1930, added by the Trade Agreements Act of 1979 and conditionally effective January 1, 1980, lists specific items that are deductible in determining the net subsidy. The list does not include "locational" expenses, and the Senate committee report states:

The list is narrowly drawn and is all inclusive. For example, offsets under present law which are permitted for indirect taxes paid but not actually rebated, or for increased costs as a result of locating in an underdeveloped area, are not now permitted as offsets. . . .

S.Rep. No. 96–249, 96th Cong., 1st Sess. 86, *reprinted in* [August 1979] U.S.Code Cong. & Admin.News, pp. ——, ——. The House committee report underscores that the list is all inclusive. H.R.Rep. No. 96–317, 96th Cong., 1st Sess. 74 (1979).

**16.** If the Treasury Department cannot, with its expertise, establish the necessary facts, a countervailing duty must be imposed, although a challenge may be brought later by the importer. Because the importer is in a better position to obtain these facts from the foreign manufacturer, once a prima facie case has been established by evidence that payments *such as those here involved* are being made, the domestic manufacturer should not (contrary to the dissenting opinion) have the burden of obtaining evidence of deductions necessary to negate its own prima facie case. Also, we note that under 19 U.S.C. § 1303(a)(5), the Secretary is permitted to *estimate* the net bounty (*i. e.*, estimate the necessary deductions), and his expertise will play a part in this estimate as long as there is a factual basis to support it.

arguments" can be made in support of both review *de novo* and review on the administrative record. . . .

Coincidentally, on the same date of the above opinion, the Congress enacted the Trade Agreements Act of 1979 (Pub.L. 96–39, 93 Stat. 144, enacted July 26, 1979), which added a new section 516A to the Tariff Act of 1930 in which the scope and standards of judicial review are specified.[17] The Senate Finance Committee report (S.Rep. No. 96–249, 1st Sess. 251–52)[18] accompanying the bill that was enacted (H.R. 4537) discussed the new provisions, which were designed to "clarify the scope and standard of review," as follows:

> *Scope and standard of review.*—Section 516A clearly defines the scope and standard of review in suits challenging antidumping and countervailing determinations and orders. Currently, the state of the law in this area is unclear and conflicting.
>
> Subsection (b) of new section 516A sets forth the standard of review for those antidumping and countervailing duty determinations which will now be reviewable. Under present law, determinations by the International Trade Commission

have been set aside only where found to be arbitrary or contrary to law. More controversial, however, is the standard to be applied to determinations by the Secretary of the Treasury. The Treasury Department has consistently asserted that antidumping and countervailing duty determinations, unlike traditional value and classification decisions, are not subject to *de novo* review. A reading of the two recent countervailing duty decisions in the Customs Court . . . indicates that some differences of opinion exist with respect to the issue.

> Section 516A would remove all doubt on whether *de novo* review is appropriate by excluding *de novo* review from consideration as a standard in antidumping and countervailing duty determinations. *De novo* review is both time consuming and duplicative. The amendments made by Title I of the Trade Agreements Act provide all parties with greater rights of participation at the administrative level and increased access to information upon which the decisions of the administering authority . . . are based. These changes, along with the new requirement for a record of the proceeding, have eliminated any need for *de novo* review.

---

**17.** Section 516A provides, in appropriate part:
(a) Review of Determination.—
. . . . .
(2) Review of Determinations on Record.—
(A) In General.—Within thirty days after the date of publication in the Federal Register of—
(i) notice of any determination described in clause (ii) . . . of subparagraph B . . .

. . . . .

an interested party who is a party to the proceeding in connection with which the matter arises may commence an action in the United States Customs Court by filing a summons, and within thirty days thereafter a complaint, each with the content and in the form, manner, and style prescribed by the rules of that court, contesting any factual findings or legal conclusions upon which the determination is based.
(B) Reviewable Determinations.—The determinations which may be contested under subparagraph (A) are as follows:

. . . . .

(ii) a final negative determination by the Secretary . . . under section 303 . . . of this Act.

. . . . .

(b) Standards of Review.—
(1) Remedy.—The court shall hold unlawful any determination, finding, or conclusion found—

. . . . .

(B) in an action brought under paragraph (2) of subsection (a), to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law.
(2) Record for Review.—
(A) In General.—For the purposes of this subsection, the record, unless otherwise stipulated by the parties, shall consist of—
(i) a copy of all information presented to or obtained by the Secretary . . . during the course of the administrative proceeding, including all governmental memoranda pertaining to the case and the record of ex parte meetings required to be kept by section 777(a)(3); and
(ii) a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register.

. . . . .

**18.** *Reprinted in* [August 1979] U.S.Code Cong. & Admin.News, pp. ——, ——.

Under section 1002(b) of the 1979 Act, the new provisions have no retroactive effect upon the case before us. However, we note the emphasis placed by the Congress on the fact that the new provisions "have eliminated any need for *de novo* review" by providing "all parties with greater rights of participation at the administrative level" and, further, by providing "increased access to information upon which the decisions of the administering authority . . . are based . . . along with the new requirement for a record of the proceeding . . . ." Accordingly, and in furtherance of the administration of justice, we conclude that a trial *de novo* is indicated in this case so that the merits of the issue of the amount of the net bounty herein involved can be fully developed. Our conclusion is reenforced by the action of Congress in providing, in the Trade Act of 1974, the same right to judicial review over negative countervailing duty determinations that had been accorded importers over affirmative countervailing duty determinations.[19] With respect to the latter, this court had made clear that the importer had "the right to bring forward any questions of fact relating to the transaction and have them tested by the applicable law . . . ." *V. Mueller & Co. v. United States*, 28 CCPA 249, 257, C.A.D. 152 (1940). In that case and also in *American Express Co. v. United States*, 60 CCPA 86, C.A.D. 1087, 472 F.2d 1050 (1973), a trial *de novo* had been conducted by the Customs Court, and this court indicated no disapproval. *See Camp v. Pitts*, 411 U.S. 138, 141–42, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) and *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

In view of all the foregoing, we *reverse* the judgment of the Customs Court and *remand* for further proceedings consistent with this opinion.

MARKEY, Chief Judge, with whom RICH, Judge, joins, dissenting.

With due respect, and recognizing fully the frustration imposed by the absence of a statutory definition of "bounty," I dissent.

*The Nature of the Appeal*

The case comes to us on appeal from the grant of summary judgment to defendant. Both parties sought summary judgment. Both insist that no fact issue is present. Hence, the sole question before us is whether appellants have established on the present record that the payments here involved constituted a bounty *as a matter of law*. I cannot find in the record of this case a basis in *law* for reversing the judgment of the Customs Court[1] or for disturbing the decision of the Secretary that no bounty was here paid.

Nothing in the state of the law applicable to this case precludes the Secretary's acceptance of another government's advice that its payment merely offset disadvantages of moving. Nor has appellant shown anything to suggest that the advice accepted here was untrue. Absent a clear legal basis, and absent contrary evidence, the courts should avoid even an appearance of directing the Secretary to disregard statements of sovereign foreign governments with which he and our government must deal daily on a wide variety of matters.

The legal posture on appeal might be different if it could be said that appellants had established on the record an excess in the government payment over the foreign manufacturer's costs incurred in meeting his government's goals. If proved, that excess might or might not constitute a bounty. Its absence means there is no support whatever in the present record for the majority's assertion that a bounty was here paid.

*The Presumption of Correctness*

Lost in the shuffling march of the majority opinion toward a desired result is the statutory presumption of correctness attaching to the Secretary's *decision* that a bounty was not paid. 28 U.S.C. § 2635(a). The statute and the Customs Court's determination that appellants had failed to overcome the presumption are quoted in the Background section of the majority opinion,

---

19. *See* Conf.Rep. No. 93–1644, 93d Cong., 2d Sess. 45, *reprinted in* [1974] U.S.Code Cong. & Admin.News at p. 7389.

1. It is not necessary that this court agree with the reasoning of the Customs Court. It is a judgment we review.

but I search the OPINION section in vain for any reference whatever to the presumption, or to the evidence by which appellants overcame it.

Footnote 16 of the majority opinion is the sole reference in the majority opinion to burden-of-proof considerations. It misconstrues appellant's burden, in stating that "the domestic manufacturer should not . . . have the burden of obtaining evidence of deductions necessary to negate its own prima facie case." The *statutory* burden is to obtain and submit evidence that the Secretary's decision was incorrect, i. e., in the context of the footnote, that some or all deductions were improper.

The majority opinion necessarily rests on the unstated premise that mere proof of the existence of the payments "here involved"[2] constitutes sufficient evidence to overcome the presumption of correctness. It then proceeds to analyze the Secretary's reasons supporting his decision and finds them wanting.[3] But thereby it shifts, contrary to 28 U.S.C. § 2635(a), the burden of proof to the Secretary.

Application and enforcement of the statutory presumption of correctness cannot be escaped by leaping to a judicial analysis of the bases for the Secretary's decision. The Secretary, confronted only by proof that payments had been made, may have been tactically unwise in attempting to justify his decision. If so, that circumstance does not entitle a court to disregard its duty to apply 28 U.S.C. § 2635(a).

If the presumption and burden application of 28 U.S.C. § 2635(a) means anything, it means that only after a domestic manufacturer has submitted evidence that a payment constituted a bounty, i. e., some evidence that the Secretary's negative decision was incorrect, need the Secretary be required to go forward with evidence in support of his decision. Even then, the ultimate burden of proving the Secretary's decision incorrect remains with the domestic manufacturer. In the present record, I find no evidence submitted by appellants that the payments here involved constituted a bounty, and the majority opinion cites none. Absent that proof, the question of whether the Secretary's bases for his decision would appear adequate to this court is simply not, and should not be, reached.

I agree that American manufacturers carry a burden most heavy and probably unfair. They are faced with a presumption of correctness favoring the Secretary's negative finding, and have limited access to foreign data more readily available to the Secretary and to an importer. But the cure is for Congress to devise. No judge is and none ever truly was, an oracle. That judges do make law, however, argues for reasoned restraint, and for limitation of that institutional imperative to cases of clear necessity. Concerning the design and placement of the present burden of proof, Congress has spoken, leaving no room in this case for the courtroom creativity reflected in the majority opinion.

### The Merits

Assuming the existence of a basis for disregarding Congress' placement of the burden of proof, and for thereby opening the door to judicial probing of the Secretary's reasoning in this case, I would nonetheless affirm the judgment below.

2. There is no magic in the phrase "the payments here involved." Except for their admitted non-*de minimis* nature, they are indistinguishable in law from any other payments. Section 303(a) says "Whenever any country * * * shall pay * * * any bounty * *." The distinction is not in the size or nature of the payment, or in its relation to other payments relating to other products by other countries, but in whether it constitutes a bounty.

3. The majority opinion's foray into trade distortion analysis is both inappropriate and flawed. There is no precedent or warrant for this court

to substitute its judgment for that of the Secretary, by deciding that every non-*de minimis* payment meets factor (1), or that 20 percent exportation in every case meets factor (2), or that a payment amounting to less than 2 percent of the value of product produced must always have a positive effect on exports and thus meets factor (3). No basis exists for a court-created "presumption" of beneficial effects. That the Secretary found a bounty in another case, absent proof of identity of all factors, bears no relation to whether a bounty was here paid.

Concerning the determination of the existence or nonexistence of a bounty, the Congress unquestionably left to the Secretary the clear discretion to decide.[4] Congress has, moreover, consistently refused to impede or guide that discretion by statutory definition or guidelines to be used in its exercise.[5] Absent violation of the Constitution, or a concern of virtually equal dimension, the courts should not rush in where the people's representatives have refused to tread.[6]

Naked of guidance, and faced with provisions for judicial review, the Secretary has assertedly employed a guideline of his own devising, i. e., the presence or absence of distortions and of barriers to trade caused by the challenged payments. Though "distortions" and "barriers" are terms undefined, the Secretary's references to sales of float glass in various locales were apparently meant to show absence of distortion or of erected barriers. The Secretary's approach to the exercise of his discretion is in my view perfectly reasonable.

In all events, the Secretary's approach appears far more reasonable than that set forth in the majority opinion. Reasonableness resides in equating the absence of a bounty with failure of a payment to produce adverse trade effects. The majority opinion's effective equation of every payment to a foreign manufacturer (by a government, person, partnership, association, cartel, or corporation) with a bounty is an approach not recommended by reason. It is creative of chaos. Administrative, diplomatic, and judicial channels would be clogged if every payment to every manufacturer were presumptively a bounty and subject to judicial review for its "net" amount, and if that review were available to every manufacturer upon a mere showing that a payment had been made. The law is not, and should not be made, an adversary of common, practical sense.

The majority opinion's discussion of the Secretary's waiver authority, though in my view irrelevant to whether a bounty was here paid, does serve to confirm the absence of reason from the majority opinion's approach. The grant is of authority to waive *imposition* of countervailing duties *after* a bounty is found. It is not a grant of au-

4. The majority opinion confuses the "mandatory" duty to *impose* duties countervailing a found bounty, with the preliminary, separate, and *discretionary* duty to determine whether a bounty exists.

5. The majority opinion appears oblivious to the Secretary's discretion to determine what is or is not a bounty or grant. This court has stated, "Congress' intent to provide a wide latitude, within which the [Secretary] may determine the existence or nonexistence of a bounty or grant, is clear from the statute itself, and from the congressional refusal to define the words 'bounty,' 'grant' . . . in the statute or anywhere else, for almost 80 years." *United States v. Zenith Radio Corp.*, 562 F.2d 1209, 1216 (CCPA 1977), aff'd, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). In reporting the Trade Agreements Act of 1979, Congress acknowledged that, under the provision here at issue, "The Secretary of the Treasury has discretion in determining what is a bounty or a grant." Report of the Committee on Finance of the United States Senate on H.R. 4537, S.Rep. No.96–249, 96th Cong., 1st Sess. 84 (1979). *See also* Berger, *Judicial Review of Countervailing Duty Determinations*, 19 Harv.Int'l L.J. 593, 604–606 (1978); O'Neill, *United States Countervailing Duty Law: Renewed, Revamped and Revisited—Trade Act of 1974*, 17

B.C.Indust. & Comm.L.Rev. 832, 864 (1976); Butler, *Countervailing Duties and Export Subsidization: A Re-emerging Issue in International Trade*, 9 Va.J.Int'l L. 82, 125 (1969). As this court has repeatedly stated, countervailing duty determinations involve complex economic and foreign policy decisions of a delicate nature, for which the courts are woefully ill-equipped. *United States v. Hammond Lead Products, Inc.*, 58 CCPA 129, C.A.D. 1017, 440 F.2d 1024, cert. denied, 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971); *United States v. Zenith Radio Corp., supra.*

6. The majority lays store by what it finds to be a general intent of Congress to "tighten" administration of § 303(a). But those considerations arise, as the majority opinion elsewhere states, "once it has been determined that a bounty or grant [has been] paid or bestowed." We are here charged only with reviewing a judgment upholding a determination of the Secretary that no bounty was paid in this case, not with a duty of forcing the Secretary to impose duties when no bounty was determined. Nor are we charged with a duty of somehow guarding against Secretarial chicanery. Nor do I see "adverse effects" as a "narrow or restricted" interpretation of "bounty."

thority to waive the earlier duty to determine whether a bounty exists. Congress's limitation, in § 303(d), of waiver of duties to those situations in which "*the* adverse effect of a bounty" (emphasis mine) is being reduced, seems the clearest congressional recognition that adverse trade effects are *inherent* in the concept of "bounty." No citation of authority is needed for the proposition that Congress does not legislate unnecessarily; and it did not do so here. In § 303(d) it provided that *when* the Secretary found a bounty he could waive the otherwise mandatory duties if "the" adverse effects of the bounty were being or about to be reduced or eliminated. Thus § 303(d) rests, in my view, on a legislative *presumption* that bounties produce trade barriers and adverse effects.

Moreover, if a bounty could exist without adverse effect on international trade, who cares? What would there be to shout about on the international stage? And, absent adverse effects and distortions to be reduced and eliminated, whence the bases for waiver?

It defies reason, in my view, to posit a relationship relevant here between the Secretary's consideration of whether adverse trade effects exist (in determining existence of a bounty) and his consideration of whether those effects are being reduced (in deciding whether to waive duties). The Secretary's initial consideration of adverse trade effects may result in finding there are none, and a consequent finding that no bounty is being paid. That sequence is not an avoidance of an exercise of the Secretary's waiver authority. The majority opinion's insistence that the Secretary must be prevented from somehow engaging in a charade, i. e., from evading his duty to find a bounty by reliance on an absence of adverse trade effects, and from thereby achieving a surreptitious waiver, is at best inappropriate.

It is true that Congress has not defined "bounty" as "payments distorting trade." Nor has it defined "distortion," or "barriers," or "adverse effects." But that is not to say that Congress has precluded the Secretary from determining absence of a bounty where payments do not distort trade. On the contrary, Congress recognized in § 303(d) that bounties do distort trade.[7]

### Injury

Though the absence of adverse effects on international trade should raise no ruckus on the international stage, payments to those who export to our country can raise deep domestic disturbances. Respecting such payments, congressional response to concerns of American business, though arguably ambivalent, consists of just three main elements: (1) If those payments are determined by the Secretary to be a bounty, he must impose countervailing duties (or waive their imposition in limited circumstances); (2) injury or non-injury to American business shall not be a factor in determining whether a bounty is being paid; and (3) American manufacturers can obtain judicial review of the Secretary's determination that a bounty was not paid.

The majority opinion recognizes that Congress disdained the "injury concept," but, with no authority, and contrary to all legislative history, the majority opinion then converts the rejected concept of injury to domestic business into "injury to United States trade".[8] It then accuses the Secretary of "injecting" the latter concept into countervailing duties cases and of erroneously employing "an injury (to United States trade) test." The complete answer is, "Certainly!" That is the name of this game. It is precisely the trade relation-

---

**7.** The majority opinion's approach would place the burden of justifying the exercise of his waiver authority upon the Secretary in an American manufacturer's suit challenging a waiver.

**8.** The sole statutory reference to "injury" is: "whether *an industry in the United States is*

being or is likely to be injured." 19 U.S.C. § 1303(b)(1)(A) (emphasis mine). Determinations of domestic injury are limited to duty-free goods and, even then, domestic injury determinations are required only in response to U. S. international obligations. 35 U.S.C. § 1301(a)(1).

ships of the United States with other countries that constitute the *raison d'être* for our countervailing duty laws.[9]

### Net Amount

After seeming to reject appellants' assertion that any payment requires a countervailing duty, the majority opinion says that once it is established that a foreign manufacturer is receiving payments such as those here involved from its government, a countervailing duty *must*, absent a waiver by the Secretary, be imposed, unless there is no net benefit.[10] The majority then requires a virtual audit by the Secretary of a foreign manufacturer's operations, to establish whether a payment exceeded the manufacturer's cost (here of moving), and, if so, by how much. If the payment exceeds moving costs, the majority opinion says the excess is the "net amount" of the bounty by which countervailing duties must be measured. The majority opinion would thus insist that a bounty was paid (but no countervailing duties would be imposable) when a payment is equal to or less than the costs of moving. Harkening again to a plea for practicality, I cannot see the value in creating even the potential for requiring investigation of every payment made to a foreign manufactur-

er; nor can I estimate the hoards of government employees, buildings, and paper supplies, involved in meeting that potential.

Earlier court opinions have not distinguished "bounty" from "net amount" in the manner suggested in the majority opinion because there is no such distinction there. *If* the Secretary finds a bounty, he must calculate or estimate the net in determining the countervailing duty. If there be a payment exceeding expenses, that excess may or may not adversely effect world trade. If it doesn't, there is no bounty. But if there is zero excess, i. e., zero "net," there is also zero "bounty," and there is nothing to countervail. In *law*, a payment resulting in *no* net benefit cannot be held a "bounty" countervailable under § 303.[11]

### Conclusion

The majority opinion, having assumed, *sub silentio*, that Congress's provision for countervailing the net amount of a bounty means there must somewhere be a gross bounty, and that the payment here was (as every non-*de minimis* payment would be) a gross bounty, remands the case for a trial to determine whether there was a net payment to be countervailed.[12] In so doing it

9. The majority opinion does not reconcile its recognition that Congress rejected an injury test with its quotation from S.Rep.No.93–1298, wherein it finds the congressional purpose to be an assurance of "effective protection of domestic interests from foreign subsidies." The majority opinion confuses the underlying basis of countervailing duty law—the distortion of trade which results from certain practices, and *thereby* damages domestic manufacturers—with the congressional intent to relieve complaining domestic manufacturers from the unfair and often insurmountable burden of having to prove direct injury to their business resulting from such trade distortion.

10. Though the majority opinion refers to payments to a manufacturer "from its government," the statute, and presumably the majority statement, encompasses payments from the many sources listed *supra.*

11. In *Zenith Radio Corp. v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) the Court held that remission of a sales tax was not a bounty, there being no excess "remission." The Court was not dealing with a subsi-

dy on production. The majority opinion's recognition that an excess in *Zenith* would have led to a conclusion that a bounty had been paid, however, confirms the absence of any distinction between "bounty" and "net amount of bounty."

Our government pays millions to American industry, in fostering numerous social programs. If a payment exceeds the manufacturer's cost in carrying out the program, e. g., one of minority enterprise, and the payment had no effect on world trade, it could hardly be deemed a bounty. If the payment did not exceed costs there would be not only no effect on trade but there would be nothing to be countervailed.

12. The majority opinion's discussion of scope of review and the admittedly inapplicable Trade Agreement Act of 1979 is of little aid in this case, where the parties have submitted the question as one of law on cross motions for summary judgment, each standing on the record as it exists. I agree that substantive judicial review is impossible without an adequate factual record. But no such record is here

creates a material fact issue, not raised below, ignoring the fact that this case is here on requests for summary judgment made by both parties below, which presupposes no such issue.

The one clear point in the majority opinion, to me at least, is the view that *all* payments, including the one here, are (at least in gross) bounties, and that proof of payment alone imposes on the Secretary a burden to prove that there is no net amount to be countervailed. That view cuts the Gordian knot of frustration (by defining "bounty" as any non-*de minimis* payment) but it severely restricts the Secretary's discretion to determine whether a "bounty or grant" exists, ignores the statutory presumption of correctness, and would require a trial *de novo* to determine net amount in every suit challenging a negative countervailing duty determination. More importantly, by rejecting the Secretary's right to rest his discretionary bounty determinations on the presence or absence of adverse effects on world trade, the majority opinion opens a ponderous Pandora's box which only Congress or the Supreme Court, after long travail, may close.

Perceiving no reversible error, and because appellants failed to carry their burden of overcoming the statutory presumption of correctness attaching to the Secretary's decision that no bounty was paid, I would affirm the grant of summary judgment to defendant in this case.

required. That appellants chose to stand on the record they made is enough in this case for the court to hold on *that* record, that appellants' burden was not met. Hence, no basis exists for this court's requirement that the parties go back and create a new "adequate factual record."

Congress moved rapidly to provide the Secretary and the courts with the review standards set forth in the Trade Agreement Act of 1979. That happy event does not, however, warrant this court's attempt to keep alive a *de novo* review standard by requiring a trial here, where the matter comes up on summary judgment alone. Moreover that Congress resolved a dispute over whether *de novo* review was proper in countervailing duty cases, does not establish that *de novo* review had earlier been proper. If any implication exists in Congress' provision for review in the Trade Agreement Act, it would be that *de novo* review had never been appropriate.