CARLISLE TIRE AND RUBBER COMPANY, PLAINTIFF *v.*
UNITED STATES, DEFENDANT

Before MALETZ, *Judge.*

Court No. 79–5–00748

(Dated September 11, 1981)

*Eugene L. Stewart* and *Daniel G. Rooney* for the plaintiff.

*Stuart E. Schiffer*, Acting Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch (*Sheila N. Ziff* on the brief), for the defendant.

*Lauren R. Howard; Collier, Shannon, Rill & Scott* of counsel; for *amicus curiae* Bicycle Manufacturers Association of America, Inc.

MALETZ, *Judge:* Plaintiff, a domestic manufacturer of bicycle tires and tubes (BTT), challenges a negative countervailing duty determination published by the Secretary of the Treasury on January 12, 1979 involving bicycle tires and tubes from the Republic of Korea. 44

FR 2570–1. The determination was rendered under section 303 of the Tariff Act of 1930, as amended (19 U.S.C. § 1303), as that provision existed prior to January 1, 1980.[1]

In substance, the Secretary found that three Korean BTT manufacturers, Hung-A Industrial Co. Ltd. (Hung-A), Dae Yung Tire & Rubber Co., Ltd. (Dae Yung), and Korea Inoue Kassei Co., Ltd. (Inoue) received benefits from the Government of Korea under various countervailable programs. However, the Secretary further found that the aggregate benefits received by Hung-A and Dae Yung were 0.34 percent and 0.31 percent, respectively, which were considered *de minimis* in size and hence need not be countervailed.[2]

Presently before the court are cross-motions for summary judgment. Plaintiff argues (1) that even a *de minimis* benefit must be countervailed; and (2) that in any event amounts received by Hung-A and Dae Yung were not *de minimis* but actually were much greater than the amounts found by the Secretary. Defendant and *amicus curiae* argue, on the other hand, that the *de minimis* rule is applicable to a countervailing duty determination and that the Secretary correctly determined the amounts of the benefits.[3]

## I

We consider first plaintiff's claim that even *de minimis* bounties and grants must be countervailed because of the mandatory language of the countervailing duty statute. However, this identical argument by the same plaintiff was rejected in this court's recent decision in *Carlisle* I, 517 F. Supp. at 706, where it was held that the *de minimis* doctrine is applicable to cases arising under the countervailing duty statute.

## II

We turn next to plaintiff's argument that benefits received by Hung-A and Dae Yung from the Government of Korea under three countervailable programs were not *de minimis* but actually were much greater than the allegedly erroneous amounts found by the Secretary. The programs involved (1) accelerated depreciation; (2)

---

[1] January 1, 1980 was the effective date of the countervailing duty amendments made by the Trade Agreements Act of 1979. 93 Stat. 306–7 (1979).

[2] In the same determination, the Secretary assessed countervailing duties against Inoue whose aggregate benefits amounted to 0.50 percent ad valorem. Plaintiff does not contest this assessment.

[3] It is to be noted that this case arises under the "old" countervailing duty law. Therefore the Secretary's determination of the amount of the net bounty or grant, as well as his decision not to impose countervailing duties, is subject to *de novo* review. *ASG Industries, Inc.* v. *United States*, 67 CCPA 11, 23, C.A.D. 1237, 610 F. 2d 770, 778–80 (1970)." Thus a mere showing of reasonableness on the part of the * * * [Secretary] does not suffice to establish the correctness of * * * [his] determination." *Carlisle Tire and Rubber Company* v. *United States*, 1 CIT 352, 517 F. Supp. 704, 708 (1981) (hereafter referred to as *Carlisle* I).

preferential income tax treatment; and (3) preferential short-term financing. Each of these programs will now be considered.

1. *Accelerated Depreciation.* Under Article 51 of the Enforcement Decree to the Korean Corporation Tax Law, certain businesses earning more than 50 percent of their total income during the business year from foreign exchange may increase the depreciation allowance for fixed assets used directly for exporting by 30 percent over the normal depreciation allowance. The Secretary found that in 1977, Hung-A benefited under this provision in an amount equal to 0.06 percent ad valorem which defendant later corrected to 0.09 percent.

The dollar amount utilized by Treasury in the computation of ad valorem value was supplied by the Government of Korea in response to a Customs' countervailing duty questionnaire. According to this response, Hung-A received $13,029 in benefits under the accelerated depreciation program. Allegedly this information was provided to the Government of Korea by Hung-A.

The manner in which Hung-A or the Korean Government computed the figure was unknown, as was the amount of normal depreciation experienced by Hung-A in 1977 and the amount of increased depreciation that Hung-A claimed in 1977. The figure of $13,029 supposedly supplied by Hung-A and transmitted by the Government of Korea was simply accepted by Treasury. Rather than seeking clarification, Treasury assumed the figure was correct in accordance with its policy of relying "upon the integrity and credibility of the responding foreign governments."

However, the attention of Treasury was directed to financial statements for the year 1977 that were filed by Hung-A in a then co-pending antidumping investigation. More specifically, Hung-A's Profit and Loss Statement and Statement of the Cost of Goods Manufactured, which were prepared by the company's certified public accountant and certified by the company's managing director to be true and correct, show that for the year 1977 Hung-A claimed normal depreciation in the amount of $710,656.66. Also, the record shows that in 1977, Hung-A took advantage of the program permitting accelerated depreciation in an amount equal to 30 percent of normal depreciation. Since Hung-A in that year claimed normal depreciation in the amount of $710,656.66, this amount for tax purposes seemingly should have been increased by 30 percent or $213,196.99.

This certified financial information provided directly by Hung-A to Treasury thus clearly called into question the accuracy of the depreciation figure of $13,029 supplied by the Government of Korea. In the face of this conflict, Treasury was not justified in accepting as complete and accurate the figure provided by the Korean Government, the origin of which was unknown. The ipse dixit of the Govern-

ment of Korea was "hardly a factual basis supporting the conclusion that" the amount of the benefit received by Hung-A under the accelerated depreciation program was as set forth in its submission. *ASG Industries, Inc.* v. *United States, supra,* 610 F. 2d at 778 and n. 16.

Finally, in support of its motion for summary judgment, plaintiff states that the depreciation expenses presented in Hung-A's financial statements for 1977 were computed in accordance with generally accepted principles of accounting. Based on that premise and coupled with the fact that Hung-A exported 80 percent of its production by quantity, plaintiff has prepared its own computation concluding that the amount of the benefit received by Hung-A in 1977 under the accelerated depreciation program was 1.16 percent ad valorem.

What this all comes down to is that the figure of $13,029 which the Government of Korea transmitted to Treasury as the amount of benefit received by Hung-A in 1977 under its accelerated depreciation program cannot be reconciled with the depreciation figures contained in Hung-A's own financial statements. Added to that, in the absence of explanation, it would appear that Hung-A's own financial data— which Treasury disregarded—would provide a more reliable indication of the accelerated depreciation benefits Hung-A received than the figure presented to Treasury by the Government of Korea. Given this circumstance, were it not for the conflict in figures, the court would be inclined to deem persuasive plaintiff's computations based on Hung-A's financial data. However, with this conflict unresolved, the court does not have sufficient information to determine what the truth is.

2. *Preferential Income Tax Treatment.* In his determination, the Secretary concluded that Dae Yung did not benefit under any of the Government of Korea's laws authorizing a reduction in, or exemption from, income taxes on business income. Plaintiff insists that this determination is erroneous, arguing that Dae Yung's income tax liability for 1977 was so low that it represented tax treatment amounting to a bounty or grant for which a countervailing duty should have been imposed.

The facts are these. During the then co-pending antidumping duty investigation involving bicycle tires and tubes from Korea, Dae Yung submitted to Treasury a Profit and Loss Statement covering its bicycle tire and tube operations for the calendar year 1977. That statement shows that in 1977 Dae Yung paid $4,643.74 in income taxes on a pretax income from BTT sales of $441,886.79—an income tax rate of only 1.05 percent.

The record indicates that in 1977, Dae Yung was not a publicly held corporation and therefore was treated as a closed corporation for Korean tax purposes. Under the tax laws of Korea, the income tax

rate applicable to closed corporations that earned a net pretax income in excess of 5 million Won—which Dae Yung did—was 40 percent.

In its original petition, plaintiff claimed that the Korean BTT manufacturers were being subsidized by their government under various programs. The Government of Korea was queried about these programs and submitted responsive information in the spring of 1978. Subsequent to this submission, Dae Yung's Profit and Loss Statement came to the attention of counsel for plaintiff who then specifically brought it to the attention of Treasury by letter dated September 18, 1978.

When this matter was thus brought to its attention in connection with its countervailing duty investigation, Treasury had a duty, in accordance with the Congressional mandate, to make appropriate inquiries. However, Treasury did not pursue the matter. Therefore the Government of Korea was never afforded the opportunity to present an explanation or otherwise indicate specifically that Dae Yung did not receive preferential income tax treatment. Consequently, there is nothing in the record to indicate that Dae Yung did not enjoy a benefit from its virtual tax-free status in 1977. In sum, the court has no factual basis for concluding that no net benefit had been received by Dae Yung.

We turn next to a contention by plaintiff that it is entitled to summary judgment on the basis of the information contained in Dae Yung's 1977 Profit and Loss Statement. Plaintiff reasons that at the normal Korean tax rate of 40 percent, Dae Yung had a potential tax liability of $176,754.55. It then asserts that since Dae Yung paid an actual income tax of only $4,643.74, it achieved an income tax saving of $172,110.81. According to plaintiff, dividing this saving in income tax by the amount of Dae Yung's total BTT sales in 1977 ($11,716,258.40), yields a countervailable ad valorem benefit of 1.47 percent.

But there is a basic difficulty with the entire premise of plaintiff's argument—bottomed as it is on the disparity between the actual tax paid by Dae Yung and the normal applicable rate. As *amicus curiae* points out, there are many other factors such as deductions or credits which could account for this disparity. In sum, plaintiff's claim that Dae Yung received a 1.47 percent ad valorem tax preference benefit is entirely speculative.

3. *Short-Term Preferential Financing.* During 1977, the Government of Korea, pursuant to the "Regulation for Export Financing," made available to exporters short-term loans at preferential rates for the purpose of acquiring raw materials used in production for export. These loans were repayable within 90 to 180 days at an interest rate of 8 percent. At the time, the commercial rate for similar loans was between 15 percent and 18 percent.

Both Dae Yung and Hung-A received funding under this program. In response to Customs' countervailing duty questionnaire, the Goverment of Korea stated that the monetary value of the benefit under this program to Dae Yung was $31,300 and to Hung-A, $41,400. Based on these two figures which Treasury accepted as accurate, even though it concededly did not know how they were calculated, Treasury determined that the ad valorem value of the benefit amounted to 0.31 percent in the case of Dae Yung and 0.28 percent in the case of Hung-A.

Other than a general claim by the Korean Government that pertinent data was supplied by the BTT producers, the record is barren of information concerning the origin of the data utilized by the Secretary. There is nothing in the record that would afford insight into the manner in which the respective benefit amounts were derived or the formula or methodology that was employed. As in *Carlisle* I, 517 F. Supp. at 708, the data obtained by the Secretary did not indicate the amount of each loan and the actual duration of time it was outstanding. Thus, the Secretary's determination as to the ad valorem value of the benefits to Dae Yung and Hung-A was based on inadequate data.

Similarly without foundation is plaintiff's claim that the two figures submitted by the Korean Government represent interest expense savings for only a single month. Plaintiff would extrapolate these figures to yearlong figures on the assumption that the loans were continuously received throughout the year. On this basis, plaintiff calculates that Dae Yung saved $380,817 and Hung-A saved $503,700 in interest expenses during 1977. But this approach is speculative and rests on an assumption which lacks support in the record.

### III

From the foregoing, it is apparent that the record does not contain sufficient information to enable the court to determine or reasonably estimate the amount of benefits received by the Korean exporters, let alone decide whether or not such benefits are *de minimis*. In sum, neither party has demonstrated what the truth is and plaintiff's motion and defendant's cross-motion for summary judgment are therefore denied.

Given this denial of the cross-motions, the court could simply allow this action to proceed to trial. But for the reasons set forth in *Carlisle* I, 517 F. Supp. at 708–709, remand of this action is warranted.

The action is stayed and the Secretary's negative countervailing duty determination is vacated. The action is remanded to the Secre-

tary of Commerce [4] for further inquiries as may be needed to determine the ad valorem benefit provided the Korean bicycle tire and tube manufacturers by the Government of Korea. The redetermination is to be made in accordance with the countervailing duty law in effect prior to January 1, 1980. See Pub. L. 96–39, Title X, §§ 1002 (b)(1)(B) and (2), 93 Stat. 307. The Secretary is directed to report his redetermination to the court within 120 days of this order.

---

[4] The functions of the Secretary of the Treasury under 19 U.S.C. § 1303 were transferred to the Secretary of Commerce pursuant to Reorg. Plan No. 3 of 1979, § 5(a)(1)(C), 44 FR 69275, 93 Stat. 1381, eff. Jan. 2, 1980, as provided by section 1–107(a) of Ex. Ord. No. 12188, January 2, 1980, 45 FR 993.