MICHELIN TIRE CORPORATION, PLAINTIFF *v.* UNITED STATES
DEFENDANT

Before WATSON, *Judge.*

Court No. 75-9-02467

(Dated October 26, 1981)

*Windels, Marx, Davies & Ives (Paul Windels, Jr.* and *John Y. Taggart* at the trial and on the briefs) for the plaintiff.

*J. Paul McGrath,* Assistant Attorney General; *David M. Cohen,* Director, Commerical Litigation Branch (*Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch and *Sidney N. Weiss,* Esq. at the trial and on the briefs) for the defendant; *Frederick L. Ikenson* for amicus curiae Rubber Manufacturers Association.

WATSON, *Judge:* Plaintiff, the Michelin Tire Corporation, brought this action under 19 U.S.C. § 1514 to contest the denial of its protest against the assessment of countervailing duties on imported x-radial steel-belted tires. The tires were manufactured in Canada by Michelin Tire Manufacturing Co. of Canada Ltd. (Michelin Canada).[1] They were entered at the ports of Portland and Calais, Maine and Baltimore, Maryland between April 2, 1973 and January 9, 1974. The countervailing duties were assessed pursuant to T.D. 73-10 (1973) and T.D. 74-254 (1974) in which the Treasury Department published its determination that these tires were subject to bounties and grants within the meaning of 19 U.S.C. § 1303 and determined that a countervailing duty of 6.7702 percent per tire should be assessed.

---

[1] Plaintiff, Michelin Tire Corporation, is a New York corporation which, during the relevant period, imported Michelin steel-belted radial tires manufactured by various foreign affiliates. Plaintiff and Michelin Canada, the producer of the tires subjected to countervailing duty, are subsidiaries of the Michelin Investment Holding Company Limited (MIHC), a Bermuda Corporation. MIHC is part of the Michelin group under Companie Generale des Establissements Michelin, the group's corporate parent, with headquarters in Clermont-Ferrand, France.

The basic determination was expressed in T.D. 73–10 as follows:

It has been ascertained that Michelin Tire Manufacturing Company of Canada, Ltd., has had constructed two manufacturing plants in the Province of Nova Scotia, one in Bridgewater, Nova Scotia, for the manufacture of steel cord for use in manufacturing tires and the other in Granton, Nova Scotia, for the manufacture of tires. A substantial majority of the tires produced are being and are expected to continue to be exported to the United States. It has been further ascertained that in connection with the establishment of the two manufacturing plants, the Government of Canada has made certain grants and made available to Michelin a special accelerated depreciation provision under Canadian income tax law. Additionally, the Province of Nova Scotia has provided certain grants and provided a low interest-rate loan and the municipalities concerned have made certain concessions which lower the property taxes on each plant.

After consideration of all information received, the Bureau is satisfied that exports of x-radial steel belted tires, manufactured by Michelin Tire Manufacturing Company of Canada, Ltd., are subject to bounties or grants within the meaning of Section 303.

Accordingly, notice is hereby given that x-radial steel belted tires, manufactured by Michelin Tire Manufacturing Company of Canada, Ltd., imported directly or indirectly from Canada, if entered for consumption or withdrawn from warehouse for consumption after the expiration of 30 days after publication of this notice in the Customs Bulletin, will be subject to the payment of countervailing duties equal to the net amount of any bounty or grant determined or estimated to have been paid or bestowed.

Section 303 of the Tariff Act of 1930, 19 U.S.C. § 1303 (1970) reads as follows:

## Countervailing duties

When ever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this chapter, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this chapter, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Secretary of the Treasury shall from time to time ascertain and determine,

or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The Secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

At an earlier stage of this action the Court denied defendant's motion to limit the scope of trial to a review of the administrative record and to limit the standard of review to whether or not the decision of the Secretary of the Treasury was unreasonable, arbitrary or capricious. *Michelin Tire Corporation* v. *United States*, 81 Cust. Ct. 157, C.R.D. 78–12 (1978). In a later opinion the Court denied defendant's motion for summary judgment and elaborated on its reasons for finding that a trial *de novo* was proper. *Michelin Tire Corporation* v. *United States*, 82 Cust. Ct. 308, C.R.D. 79–6, 469 F. Supp. 270 (1979). Following the trial the Court granted the Rubber Manufacturers Association, a trade association of tire producers in the United States, permission to file a brief as *amicus curiae.*

The basic issues in the action are whether Michelin Canada received bounties or grants upon the manufacture or production of these tires and, if so, whether the calculation of the bounties or grants and their allocation to the tires produced was correct. Plaintiff has raised a number of issues which challenge the conduct of the administrative proceeding and which, were this simply a review of the countervailing duty investigation, might be of greater importance. However, since this is a trial *de novo* the only issues which are of controlling importance are those which relate to the correctness of the administrative decision. Nevertheless, plaintiff does make some claims which, though grounded in the conduct of the administrative proceeding, raise issues in the judicial proceeding and these shall be briefly discussed.

Plaintiff argues that the deficiencies on the administrative level were such as to warrant removing the presumption of correctness normally given to the acts of the Secretary of the Treasury by 28 U.S.C. § 2635(a).[2] In effect this would place the burden on defendant to prove the correctness of its determination.

Plaintiff also asserts that due to the discretionary manner in which this determination was reached the imposition of countervailing duties was barred by Article VI of the General Agreement on Tariffs and Trade.[3]

---

[2] 28 U.S.C. § 2635(a). In any matter in the Customs Court:

(a) The decision of the Secretary of the Treasury or his delegate, is presumed to be correct. The burden to prove otherwise shall rest upon the party challenging a decision.

[3] Article VI, Anti-Dumping and Countervailing Duties:

\*          \*          \*          \*          \*          \*          \*

6.(a) No contracting party shall levy any antidumping or countervailing duty on the importation of any product of the territory of another contracting party unless it determines that the effect of the dumping or subsidization, as the case may be, is such as to cause or threaten material injury to an established domestic injury, or is such as to retard materially the establishment of a domestic industry

With respect to these claims plaintiff asserts that the defendant could not identify the specific decisionmaker in this matter, did not offer factual findings in support of its determination, did not cite precedents or express the standards of its determination, acted in response to a concealed complainant, and acted in a novel and inconsistent manner in singling out an individual company for the first time and treating it differently from the beneficiaries of similar programs in other countries.

In the opinion of the Court the presumption of correctness is not affected by vagaries in the making of the administrative determination when the challenge is subject to trial *de novo*. It is sufficient if the final determination is expressed in an understandable way. If the Court were simply making a limited review of an administrative determination expressed in the form shown in T.D. 73–10 and T.D. 74–254 it is likely that it would have first required a clarification of the determination to the extent necessary to reveal the specific nature and amount of the bounties and grants and the calculations and reasoning used to arrive at the determination of the countervailing duty. However, in these circumstances it is sufficient that the determination is clear enough for a coherent challenge to be made. The underlying detailed findings are then the proper object of discovery and their absence from the determination itself is of no moment. In this sequence of events the issuance of the determination by the Secretary of the Treasury is adequate identification of the decisionmaker.

While the initial concealment of the Rubber Manufacturers Association as the moving force behind the complaint does not commend itself to the Court's sense of fairness, it does not represent a defect in the substantive determination. Furthermore, it does not amount to a deprivation of due process in a setting in which the aggrieved party has the right to a trial *de novo*.

The claim that Michelin was singled out from among other beneficiaries of similar programs and the Government's general admissions that it was aware of other tire companies receiving similar benefits (Defendant's Admissions 11, 52 and 53) did not amount to a proven case of discriminatory enforcement of the law. See generally, *International Business Machines Corporation* v. *United States*, 343 F. 2d 914, 170 Ct. Cl. 357 (1965), cert. denied 382 U.S. 1028 (1966).

In sum, none of the deficiencies alleged by plaintiff warranted the removal of the presumption of correctness attaching to the Secretary's determination that countervailing duties should be assessed on these importations.

The Court also finds that the determination did not violate the terms of GATT. Concededly, Article VI requires an injury determination

which was not made in this case. However, the Protocol of Provisional Application provides that the United States, among others, undertook to apply Article VI "to the fullest extent not inconsistent with existing legislation." This provision allowed the continued effectiveness of inconsistent legislation if it was mandatory in nature. The countervailing duty law under which this determination was made was mandatory and therefore even though it did not require an injury determination it remained effective. Although plaintiff seeks to characterize the Secretary's application of the law as discretionary, this was not proven to be the case. The investigation, whatever its flaws, did find the existence of bounties and grants and, under the law, the Secretary had no discretion to do other than order the assessment of countervailing duties.

The proper focus of this action was on the trial and on whether plaintiff overcame its burden of disproving the correctness of the Secretary's decision. The record in this case consists of the testimony of six witnesses for the plaintiff, together with the depositions of three witnesses introduced by plaintiff, seven witnesses for the defendant and several hundred documentary exhibits. The evidence related to five principal subjects: the decision to locate in Nova Scotia, the benefits received, the computation of the benefits, the disadvantages of the location, and the allocation of the benefits to production.

The witnesses called by plaintiff were as follows:

Sidney Bloor, a Vice President and technical engineer with the plaintiff, testified concerning the technical differences between the steel-belted radial tire manufactured by Michelin and other tires, and the effect these technical differences had on tire and vehicle performance.

A. Voya Peters, an Executive Vice President of plaintiff and a Vice President of Michelin Canada, who participated in the later phase of the negotiations leading to the Nova Scotia plants, in the construction of the plants, and in the refinancing of the IEL loans, testified concerning these events.

Dr. Carl Staubli, an Executive Vice President of Credit Suisse, testified concerning the Swiss money markets in the late 1960's and early 1970's, exchange rates, and the borrowing capacity of Michelin Canada.

Marc de Logeres, the President of plaintiff and of Michelin Canada, who had supervised the investigation and the establishment of the factories in Nova Scotia, as well as the operations of the Nova Scotia plant, testified concerning those matters.

Arnaud d'Arbonneau, a Michelin employee, testified concerning a study which he had prepared to quantify the extra costs incurred Michelin Canada by reason of location in Nova Scotia rather than Ontario.

Stewart Kahn, C.P.A., an audit partner of Arthur Andersen & Co., an international accounting firm, testified concerning the

appropriate accounting method for allocation of the alleged bounties.

The witnesses testifying on behalf of the defendant were follows:

Richard Worzel, a Canadian financial analyst, testified concerning interest rates, debt financing of capital investment, and the nature of the bonds issued by Michelin Canada to Industrial Estates Ltd. (IEL).

Stanley Nehmer, a former Deputy Assistant Secretary of Commerce for Trade, and presently president of Economic Consulting Services, Inc., testified regarding the determination of the bounties, methods of allocation and the validity of the d'Arbonneau Report.

Professor Morris Mendelson, a professor of finance at the Wharton School of the University of Pennsylvania, testified with respect to interest rates in the Eurobond and Swiss money markets in 1968 through 1972, and with respect to the functioning of those markets.

Virgil Ketterling, an economist in the Bureau of Industrial Economics of the Department of Commerce, testified with respect to the conclusions on regional disadvantages contained in the d'Arbonneau Report.

Stanley Hopard, a government employee and rubber import specialist with the U.S. Bureau of Customs, testified concerning the fact that the entry papers in this case indicated that Michelin Tire Corporation paid the freight on shipments from Canada.

Jack C. Weinstein, general manager of imports and distribution for Michelin Tire Corporation, testified that Michelin Tire Corporation paid the freight from the Canadian border to the ultimate destination.

Robert P. Knapp, Jr., couns l to Michelin Tire Corporation in some matters, was called i y defendant as an adverse witness and testified concerning the report he did in late 1938 with respect to Nova Scotia and the signing of July 17, 1969 documents, which will be discussed later.

Plaintiff also offered into evidence signed copies of the depositions of Daniel L. LeJeune, Jean Chapot and Richard B. Self.

Daniel LeJeune, the Michelin engineer who had investigated Nova Scotia and who had dealt extensively with IEL with respect to the establishment of the factories in Nova Scotia, had been deposed by the government with respect to his participation in the transaction.

Jean Chapot, who was the first administrative head of the Michelin plants in Nova Scotia and who participated in the construction of the plants and their initial operation, had been deposed by the government with respect to his participation in the transaction.

Richard B. Self, the Treasury staff man in charge of the Michelin case, had been deposed by plaintiff concerning the circumstances surrounding the creation of the administrative record by the Treasury Department.

The testimony and evidence established the following background to this dispute;

In 1967 Michelin was considering the establishment of manufacturing facilities in North America to satisfy the growing demand for its belted radial tires. Plans for facilities in the United States were deferred when the U.S. Department of Transportation began to consider proposals for safety rules whose method for measurement of tire pressure would have virtually barred the belted radial tire.

In late 1967, Industrial Estates Limited (IEL), a provincial Crown corporation of the province of Nova Scotia, charged with promoting economic development, invited Michelin to establish manufacturing facilitites in Nova Scotia. Discussions on this subject were conducted by representatives in France and Nova Scotia in early 1968. In the fall of the year Michelin decided to establish a tire manufacturing operation in Nova Scotia, consisting of a tire factory and a cord factory.

In July of 1969 formal agreements were entered into between IEL and various Michelin enterprises. One provided for IEL to grant MIHC $5 million in capital grants and a maximum of $2.6 million in training grants, both of which amounts were to be used by MIHC to subscribe to the shares of Michelin Canada which would then be obligated to apply the money to make payments on the IEL loan.

The loan was from IEL to Michelin Canada in the amount of $50 million at the rate of 6 percent and took the form of purchases of $50 million of first mortgage bonds issued by Michelin Canada. The loan was utilized for construction in the period from February 1970 through December 1972.

In addition, IEL obtained agreements from the town of Bridgewater and the county of Pictou that for ten years the real property taxes on the construction financed by IEL loans would be in the amount of 1 percent per year of the actual cost of construction, accrued to tax date, without provision for depreciation. This replaced the normal method of real property taxation based on fair market value.

In 1972, 1973 and 1974, Michelin Canada also received grants under the Canadian Area Development Incentives Act (ADIA) and its successor, the Regional Development Incentives Act (RDIA) in a total of approximately $8.5 million. [Exhibit 19, p. 43]

The central issues in this action may therefore be stated as whether the above described agreements were bounties or grants and if so, whether defendant correctly calculated them and correctly allocated them to production.

Discussion will begin with the most complex of the agreements and the one in which the factual existence of a bounty or grant was most seriously disputed.

## The I.E.L. $50 Million Loan

The first IEL loan agreement provided for IEL to purchase $50 million of first mortgage bonds issued by Michelin Canada. The bonds were issued in two series: Series A, in the amount of $34 million with a maturity of 12 years and series B, in the amount of $16 million with a maturity of 20 years. Both series had interest payable semi-annually at 6 percent per annum with principal repayments to commence thirty months after issue. (A later agreement deferred payment of the first seven principal repayments and is discussed in due course.)

In addition, the loan agreement provided that capital grants for which Michelin Canada had applied under the Area Incentives Development Act of Canada would be applied to its principal and interest obligations on the bonds. Subsequently, in 1972, 1973 and 1974, Michelin Canada received the approximately $8.5 million in cash grants previously mentioned.

The $50 million loan was "taken down," that is to say, IEL purchased portions of the bond issues, in seven segments, beginning in February of 1970 and ending in December of 1972 when the manufacturing facilities were completed.

According to plaintiff, Michelin Canada could have obtained financing on equivalent terms from within the Michelin group, from its bankers, or from the issuance of its bonds. It assertedly accepted IEL financing, not for any advantage in interest rates, but rather to obtain the financial involvement of the local community and thus insure the cooperation of important public and private organizations.

According to defendant, Michelin Canada could not have obtained a comparable loan at less than 8 percent interest and the IEL loan therefore represented a bounty. The asserted bounty consisted of the 2 percent of annual interest which Michelin Canada did not have to pay during the period of the loan.

The Court's evaluation of the testimony and the evidence lead it to conclude that the rate of 6 percent was indeed preferential, but not to the extent found by the defendant. In reaching this conclusion, the Court considered a number of alternative arguments made by the parties.

To begin with, the ability and willingness of other members of the Michelin group to provide financing was not proven. Assuming, however, that financing would have been forthcoming from related corporations, the availability of such funds, and the terms on which they might be offered, could not validate the terms of the IEL loan.

This is particularly so when it is considered that the law mentions specifically the possibility of bounties and grants from other corporations and is not limited to the largesse of governments. Ultimately, the validation of an interest rate from a related company would have to come from independent and unrelated sources.

The Court therefore considered the evidence regarding equivalent financing from independent sources. It first had to pass on amicus' assertion that the search for comparable financing had to be limited to Canada. Amicus argued that allowing reference to rates outside the country in which the dutiable goods were produced might allow the validation of a rate lower than the actual cost of money to the lender. This possibility does exist, but it does not violate the Court's understanding of the countervailing duty statute. The law is not concerned with the sacrifice made by the party supplying a financial resource but rather with the benefit experienced by the recipient. The making of a loan at a rate of interest *below* the cost of money to the lender would not assure the *existence* of a bounty any more than the making of the loan *above* the cost of money to the lender would assure the *absence* of a bounty. For a company lacking creditworthiness in its national setting even a loan yielding profit to the lender could be a bounty. On the other hand, a company with the ability to obtain financing from international sources would not necessarily receive a bounty from a loan which appeared preferential within a particular national financial market.

Accordingly, since it was proven that Michelin Canada did have access to a variety of independent sources of financing outside Canada, the Court did not consider Canada to be the proper market for evaluation of the IEL loan rate.

The Court then weighed the evidence regarding possible financing from a Swiss bank, from the Swiss bond market, and from the Eurobond market.

Plaintiff offered the testimony of Dr. Carl Staubli, an Executive Vice President of Credit Suisse, that in 1968 or 1969 his bank would have made a $50 million loan to Michelin Canada at a rate of 5½ percent. He also testified that Michelin Canada could have borrowed in the Swiss bond market at an interest rate of 5¾ percent to 6 percent from 1968 through October 1969. These rates were for issues of up to 15 years, could not exceed 60 million Swiss francs per borrower (approximately $13.8 million dollars in 1968) and had to be approved by the Swiss National Bank. According to defendant's expert witness on financing, Professor Morris Mendelson, the approval process took about two years at that time.

The Court was not persuaded that the private bank loan or Swiss bond issue represented viable alternatives to the IEL loan. As to the private loan the Court found the testimony excessively conclusory. Since this was not purely a matter of expert opinion but a personal retrospective view of how his bank would have conducted itself in a given transaction, the Court would require additional supporting detail and further substantiation of the conclusion. At the very least this would involve concrete testimony regarding the exact methods by which the loan would have been accomplished including more detail as to the loan decision process.

As to the Swiss bond financing, the Court is of the view that the evidence establishes that the existence of a committed fund of $50 million was of central importance to Michelin's plans. The Swiss bond financing, due to its previously mentioned monetary limitations and time constraints, could not represent a comparable source of financing. The Court did not accept plaintiff's argument that sufficient advance arrangements could have been made by Michelin Canada to insure an equivalent flow of financing for its construction plans.

Although hindsight reveals that the obligation to repay a Swiss bank loan or bond issue in Swiss francs would have subsequently turned out to be highly disadvantageous for a firm earning Canadian dollars, this was not a factor in the Court's decision. The evidence establishes that in 1968 and 1969, had other considerations been equal, the making of a loan in Swiss francs would not have been unlikely or imprudent. It was the incompleteness of the testimony regarding the bank loan and the sum limitations and timing shortcomings of Swiss bond financing which were the defects in plaintiff's proof.

This left the Eurobond market, which, in the words of Professor Mendelson, can be described as a market formed by electronic or telecommunications. It is characterized by the issuance of securities in a currency which is not native to the investors and by the fact that issues are typically offered by an international syndicate, in many countries at once. Issues were also typically guaranteed by the parent corporation. In 1968 and 1969 the bonds were usually denominated in U.S. dollars.

The evidence established that the Eurobond market was strictly interested in the name of the issuer as opposed to the security of an issue. It was established that Michelin was a respected name and that Michelin Canada could expect to get the most favorable terms available.

Against this background the Court first had to determine the proper time for making the comparison between the 6 percent rate on the IEL loan and rates in the Eurobond market, because the period from 1968 to 1970 was a time of rising interest rates.

The government argued first for the date of February 1970 when Michelin Canada actually began "taking down" the proceeds of the IEL loan. It argued that this was the date when Michelin Canada would have gone to the Eurobond market if it did not want to pay interest before it needed the money. However, the use of the date when a borrower actually begins utilizing the proceeds of a loan is palpably unfair because a comparison at that point could attribute benefit to him from market fluctuations occurring well after his interest rate is fixed. This would not be the bestowal of a bounty but the result of unpredictable events.

For the gauging of any benefit to plaintiff it is fairest to make the comparison on the date when plaintiff became certain to receive the rate under scrutiny, not when he actually receives the amount subject to the rate under scrutiny.

Plaintiff argues that this came about relatively early in the negotiations by an oral commitment of IEL in July 1968. However, since the project at that time envisioned only one factory requiring $34 million in financing, it cannot be said that the financial terms had sufficient finality.

Plaintiff then turns to the fall of 1968 when the need for two factories was clear and when IEL reiterated its oral commitment to finance the full estimated cost of $50 million at 6 percent. Plaintiff stresses the custom of the financial community by which oral commitments of this type are considered binding and are unvaryingly honored. Although the Court has high regard for this custom, it does not, on balance, consider oral commitments to be in a form which can fix the date with sufficient reliability in bounty determinations. In short, the Court is of the opinion that an event of this nature must be recorded in some permanent form before it can serve as a basis for practical administrative and judicial comparisons.

This leaves plaintiff at the date of February 1969 when an exchange of letters took place in which IEL stated its offer of a $50 million loan at 6 percent and MIHC confirmed its agreement subject to certain conditions which did not bear on the interest rate. [Joint Exhibits 16 and 17] Defendants recede to an alternate date of July 17, 1969 which was the date of the contract for the loan. Defendant asserts that the date of contract would be the earliest date at which the terms of the agreement were sufficiently definite to make interest rate comparisons.

The Court is of the opinion that the date of a final contract is not necessarily the proper date on which to make a determination of whether the interest rate embodied in the contract is preferential in comparison to prevailing rates and represents a bounty. We are here not concerned with the enforceability of the terms of a contract but

rather with the question of whether a rate of interest represents a special, calculated advantage bestowed on the borrower. If the facts demonstrate that the loan terms were essentially agreed to at an earlier date it would not be fair to measure the bestowal of an interest bounty purely by reference to a later contract date. Here the Court has been persuaded that insofar as the interest rate is concerned the contract represented only a formalized expression of an interest rate which had been previoulsy agreed to and which is sufficiently memorialized and proved by the exchange of letters in February 1969. Once again, to make the comparison with the higher interest rates which prevailed at contract time would, in this situation, attribute to Michelin Canada a measure of bounty received purely by operation of external forces outside its control and after its receipt of a certain rate had been fixed.

In so deciding the Court does not express the opinion that the contract date is always incorrect for making interest rate comparisons. There will obviously be innumerable variations in the circumstances of different financial transactions. Here, however, the Court is of the opinion that the exchange of letters of February 1969 expresses the final understanding of the parties regarding the interest rate with a verifiable degree of definiteness so as to serve as the proper date for making a comparison with prevailing rates.

On the comparison itself, the Court was persuaded by the testimony of Professor Mendelson that the interest rate on a U.S. dollar Eurobond offering by Michelin Canada in February of 1969 would have have been approximately 7.26 percent. This was derived from a comparison to a U.S. dollar Eurobond offering by Transocean Gulf in February 1970 in the amount of $30 million at a rate of 7.26 percent.

Although the testimony makes it clear that the fixing of bond rates is not an exact science, the Court finds that the Transocean Gulf issue is fairly comparable.

Professor Mendelson also testified that the offering of an issue on the Eurobond market would require Michelin to pay 2½ percent of the offering to the underwriter and approximately $100,000 of preparation expenses, the total of which he expressed as approximately 30 base points or .30 percent added to the 7.26 percent, making it 7.56 percent.

In these comparisons the Court did not give any importance to the fact that the IEL loan was secured while Eurobond issues were unsecured. Although in the abstract this might suggest a further justification for the lower rate of the IEL loan, the testimony made it clear that security is not a factor on the Eurobond market. Since that market is being used as a benchmark, its conventions must be controlling. Nor, on the other hand, did the Court find that the $50 million

size of the theoretical Michelin Eurobond issue would have required a somewhat higher rate than the $30 million Transocean Gulf issue. In the opinion of the Court the size of the Michelin issue was within the capacity of the market to absorb without any additional interest.

For the above reasons the Court concludes that the proper time to make a determination of whether Michelin Canada was receiving an interest bounty was in Febuary of 1969, at which time the correct comparison leads to the conclusion that the 6 percent interest rate given to Michelin Canada by IEL was a bounty to the extent that it was less than the 7.56 percent interest which Michelin would have paid in the Eurobond market.

### *The Deferral of Payments of Principal*

On June 1, 1972 (shortly before the first payment of principal was due on the $50 million loan) IEL and Michelin Canada entered into a new agreement. [Joint Exhibit 135] It provided *inter alia* that, for the purpose of expansion of the plants, IEL would permit Michelin Canada to defer the first seven repayments of principal and would allow it to refinance the amounts at a rate equal to the cost of borrowed money to Nova Scotia plus $\frac{5}{16}$ of 1 percent, if the cost to Nova Scotia at the time of a deferral was less than 9 percent. This new arrangement resulted in the deferral of a sum of approximately $16 million which, taking into account the varying rates at the times of the various deferrals, was subject to a combined rate of interest of 8.9 percent.

Plaintiff asserts that the later transaction represented a refinancing of the original loan, done to allow expansion of the production facilities to include passenger car tires and to counter criticisms made during the elections in Nova Scotia that IEL had lost money on the last $16 million of the $50 million loan it had made to Michelin Canada. Plaintiff argues that the actual rate on the complete IEL financing can only be determined by combining the 6 percent rate on the $34 million which was not refinanced and the 8.9 percent rate on the deferred $16 million, thus yielding an effective rate of 7.15 percent for the entire loan. Plaintiff argues that if a bounty existed it should be measured by the differences between 7.15 percent and the prevailing rate.

Defendant argues that the transaction under discussion was a new loan and further, was a new subsidy, because the deferral of the seven payments of principal had a simultaneous present value which was not offset by the higher rate of interest paid on the deferred amounts.

In the opinion of the Court the plaintiff has failed to prove that the rate of 6 percent for the original $50 million loan should be modified

or considered to apply to less than $50 million. The documents relating to the new financing agreement [Joint Exhibits 114, 115, 135, 136 and 143] indicate to the Court that a second and separate loan was made for an amount of approximately $16 million. The only connection with the first loan was that the deferral of its first seven principal payments served as the source of funds constituting the second loan. In the Court's opinion the evidence supports a finding that Michelin Canada received a total amount of approximately $66 million from these loans; a first loan in the amount of $50 million at the rate of 6 percent and a second loan in an amount equal to the sum of the first seven payments of principal due on the second loan, or approximately $16 million at the combined rate of 8.9 percent.

The government's contention that the second loan represented an additional bounty must be examined with the foreknowledge that under the law governing this action the government could not obtain a judgment for additional duties. *Beacon Cycle and Supply Co.* v. *United States*, 81 Cust. Ct. 46, C.D. 4764 (1978). Nevertheless, the Court's opinion on this point should be rendered in order to complete the analysis of the issues in this action and possibly provide guidance in future proceedings.

The removal of the necessity of making a payment of principal has a value separate and apart from the value of the new loan in which the deferred principal is incorporated. It is reasonable to conclude that a benefit of some sort has been bestowed upon the borrower unless a showing is made that the terms of the new loan inclu e adequate payment for the deferral. The interest on the new loan pays for the use of the money during the term of the loan. It dces not normally compensate the lender for giving up its right to receive the payment of principal due on an earlier loan.

As was previously mentioned, the relationship of the interest rate to the cost of money to the lender tells us nothing about whether it is preferential or "bountiful," let alone whether it compensates for the deferral. Nor do references to the prime rate in Canada, which is a measure of the short term cost of money, bear on the question. It is apparent that the payment to IEL of $\frac{5}{8}$ of 1 percent above the cost of money to the government cannot represent more than interest for the new loan. The deferral of principal payments, not being compensated for in any way, must be a bounty.

The government proposes that the bounty be measured as if, in each year of the duration of the new loan, the discounted value of the deferred amount in that year was being received, again and again. For example, the first deferred payment of $2,244,400 in the first year of its deferral (1972) is given a present value by discounting it, using the prime rate then in effect. That amount is considered the benefit in

the year 1972. In 1973 the calculation is repeated. The deferred amount is again discounted to its present value by means of the then prevailing prime rate and the result is considered the benefit in the year 1973. By this means the benefit from the deferral of a single payment of $2,244,400 becomes $7,658,973 after eight years and the benefit from the entire deferral of about $16 million becomes $47,316,026. If deductions are made for the interest actually paid on the deferred amounts the total benefit is reduced to $39,010,404.

With respect to these calculations the Court must agree with the remark made by plaintiff's counsel in mock approbation that they give one renewed respect for the profession of economics.

This form of calculation is unacceptable because it exaggerates the benefit of a deferral of principal beyond reason and beyond what even an outright gift of the deferred sum would justify. The benefit of deferring the obligation to repay a principal sum when it is due must be limited to the effects of a single act, a single principal amount and the conventional financial benefits which its deferral bestows. If benefits exist in years after the year of deferral they cannot be more than interest ramifications of an original benefit in the year of deferral. To revive the deferred amount year after year defies reality.

The Court will not undertake an independent calculation of what the benefit from such a deferral could be. It suffices to say, for the purpose of this case, that the government's proposed calculation is unjustified. The Court is confident that if it becomes necessary conventional methods of financial analysis can be applied to this question to yield a benefit calculation which is accurate and fair.

### The Real Property Tax Arrangement

Michelin Canada's municipal tax rate was fixed for ten years at 1 percent of its construction costs by an agreement between IEL and the municipalities of Pictou (Granton) and Bridgewater. This was an alternative to taxation based on the fair market value of its property. Plaintiff failed to prove that this did not represent a bounty, as found by the defendant. Although its purpose may have been to replace the uncertainty of the normal tax calculation with a definite figure, there was no showing that the normally calculated tax would not have been greater. (Defendant's Exhibit D shows a $2.15 tax rate in Bridgewater for 1974.) Plaintiff attempted to prove that the fair market value of its property did not approach its construction cost but this took the unpersuasive form of argument and hypothesis.

In the absence of direct evidence that the special tax arrangement did not result in lower payments than would have been made ordinarily, the finding that a bounty results must be upheld. See, *ASG*

*Industries, Inc.* v. *United States,* 85 Cust. Ct. 10, C.D. 4863 495 F. Supp. 904 (1980).

## Offsets

Plaintiff claims that the bounties and grants bestowed on Michelin Canada were more than offset by the disadvantages flowing from its location in Nova Scotia. It argues that the measurable disadvantages of locating there ought to be considered in arriving at the calculation of whether a net bounty existed.

Amicus challenges the legal correctness of plaintiff's proposition that locational disadvantages can be offset against bounties or grants. Defendant appears to accept the basic proposition and confines itself first, to arguing that offsets should be allowed only in the specific areas for which the grants or bounties were given, e.g., grants for construction should be offset by excessive costs of construction due to the location. Defendant next argues that offsets should not be allowed because Michelin would have located in Nova Scotia even if it did not receive grants. Defendant also argues that only over-costs which occurred prior to the dates of entry of the merchandise in this case, that is to say, prior to 1973, should be considered. Finally, defendant argues that plaintiff's evidence was insufficient to prove the overcosts it claimed.

The legal objection of amicus to any consideration of offsets must be considered first.

Prior to the decision in *ASG Industries, Inc.* v. *United States,* 67 CCPA 11, C.A.D. 1237, 610 F. 2d 770 (1979), the Court would have agreed with amicus. In *Nicholas & Co.* v. *United States,* 249 U.S. 34 (1919), a similar offset argument was made and was rejected by the Supreme Court. In that case an act of Parliament provided for the payment of allowances to those who exported spirits "in consideration of the loss and Hindrance caused by Excise Regulation in the Distillation and Rectification of Spirits in the United Kingdom. . . ." It was argued that these payments did not represent a bounty on exportation because they were only reimbursements of expenses of manufacture necessary to accommodate the peculiar conditions and necessities of the British fiscal policy and did not even compensate the loss they were intended to reimburse.

The Supreme Court looked simply to the fact of payment and the aid to competitive position that resulted. In so concluding, the Court relied on the decision in *United States* v. *Passavant,* 169 U.S. 16 (1898), and stated in summary of that decision and with obvious approval that " . . . the decision was not determined by a con-

sideration of costs of manufacture or their reimbursement, nor by the requirements of the policies of the exporting country. . . ." 249 U.S. at 41.

More recently, a similar argument was made in an action challenging the finding of the Secretary of the Treasury that payments to float glass producers, made under an Italian regional development program, were *not* bounties or grants. In that action the Secretary's decision was defended on the ground, *inter alia*, that he had taken into account the fact that the programs provided offsets, not premiums. The Court held this consideration to be irrelevant stating that " . . . there can be but one inquiry. Was something—bounty or grant—paid or bestowed upon the manufacture or production or export of float glass? . . . Further inquiry is neither relevant nor necessary." *ASG Industries, Inc.* v. *United States*, 82 Cust. Ct. 101, C.D. 4794, 467 F. Supp. 1200, 1239 (1979), *appeal dismissed* June 18, 1980.

However, at the end of 1979 the decision on appeal of another case involving benefits to float glass producers from the West German regional development programs introduced the possibility that proof of offsets might be utilized to reduce the bounties or grants. *ASG Industries, Inc.* v. *United States*, 67 CCPA 11, C.A.D. 1237, 610 F. 2d 770 (1979).

In that case, the trial court had concluded that the Secretary's failure to impose countervailing duties was correct because the bounties did not lead to the distortion of international trade. On appeal the decision was reversed, based on the conclusion that it was error to employ a variant of an injury test when the law did not require one. The appellate court then proceeded to discuss the difference between finding that a bounty exists and the determination of a duty equal to the *net* bounty. It stated that the use of the term net bounty " . . . implies that certain deductions may be made from the actual payments to calculate the net bounty or grant and that all relevant circumstances are to be taken into account." 610 F. 2d at 777. It then stated as follows:

> Although the Secretary apparently made a feeble attempt to calculate the amount of the net bounty or grant involved here, the statement that "[t]he German Government has advised the Treasury Department that these benefits have the effect of offsetting disadvantages which would discourage industry from moving to and expanding in less prosperous regions" is totally inadequate. *If a factual basis were shown for such an assertion, it might be concluded that no net bounty or grant was involved.*[15.5] However, contrary to the dissenting opinion, the statement that Treasury was "advised" is hardly a factual basis supporting the conclusion that there was no bounty or grant. See *Yale University* v. *Department of Commerce*, 65 CCPA

97, 104, 579 F. 2d 626, 632–33 (1977). Once it is established that a foreign manufacturer is receiving payments such as those here involved (not "every payment," as the dissenting opinion imagines) from its government, a countervailing duty must, absent a waiver by the Secretary, be imposed unless, in considering all circumstances surrounding the payment, certain deductions can be established resulting in no net benefit to that manufacturer. These deductions must be established by facts [16] —not by mere allegations of the foreign government or of the enterprises receiving the bounty or grant. Needless to say, without an adequate factual record, neither this court nor the Customs Court can perform a meaningful judicial review of countervailing duty determinations. [Emphasis supplied, footnote 16 omitted.]

[15.5] Section 771(6) of the Tariff Act of 1930, added by the Trade Agreements Act of 1979 and conditionally effective January 1, 1980, lists specific items that are deductible in determining the net subsidy. The list does not include "locational" expenses, and the Senate committee report states:

> The list is narrowly drawn and is all inclusive. For example, offsets under present law which are permitted for indirect taxes paid but not actually rebated, or for increased costs as a result of locating in an underdeveloped area, are not now permitted as offsets. . . .
> S. Rep. No. 96–249, 96th Cong., 1st Sess. 86, reprinted in [August 1979] U.S. Code Cong. & Admin. News, pp. 381, 472. The House Committee report underscores that the list is all inclusive. H.R. Rep· No. 96–317, 96th Cong., 1st Sess. 74 (1979).

In light of the above the Court undertakes to evaluate plaintiff's claim that the bounties or grants it received were more than offset by the disadvantages of locating in Nova Scotia. In so doing it first must remove from the equation those benefits of the location which cannot be quantified, although it must be said that this immediately detracts from the completeness of the analysis. One advantage of the Nova Scotia location to Michelin Canada was that, unlike Ontario, it was not a stronghold of competitive interests and Michelin Canada could therefore expect, in general, closer cooperation from local government. Another advantage was that unlike Quebec, Nova Scotia was not troubled by a separatist movement, which would have presented special difficulties for a company with strong ties to France. Finally, the relatively remote location in Nova Scotia was an advantage in that it would be relatively easier to safeguard trade secrets upon which the success of Michelin depended. The existence of intangible benefits such as these raise the question of whether the CCPA's requirement, that all the circumstances surrounding the transactions be considered, can ever be fully satisfied in a judical sense, in an overall analysis of a location's advantages and disadvantages.

With these broad considerations put aside the Court turns to the specific disadvantages asserted by Michelin Canada. These fall into the general categories of transportation, energy, training, storage and taxation. Plaintiff's proof on this subject consisted of a report [Plain-

tiff's Exhibit 19] prepared by Arnaud d'Arbonneau, an employee of Michelin Canada and his related testimony.

Defendant's argument that offsets must be limited to the specific categories of the grants or bounties is rejected. Although these regional development programs may channel their aid into specific categories such as construction, it is abundantly clear that they are intended to compensate for a wide range of disadvantages of the region. A distinction must be recognized between the variety of problems which these programs are intended to alleviate over a prolonged period of time and the necessity of embodying the aid in a form which can be of practical use to a recipient. If offsets are to be considered, a fair evaluation must take into account the full range of disadvantages of the region and not limit itself to the nominal category of the grant. In addition, the language of the CCPA, upon which we rely here for guidance, speaks with reference to the general class of disadvantages which would discourage industry from moving to, and expanding in, less prosperous regions and does not confine itself to offsets which exactly correlate with the category of the grant.

The government and amicus also argued that Michelin would have located in Nova Scotia whether or not it received grants and therefore, as far as Michelin was concerned, the grants were incremental payments. In the opinion of the Court however, the evidence establishes that the grants were a significant consideration in Michelin's decision to locate in Nova Scotia and are the appropriate object of offsets, if they are proven.

The government's penultimate argument, that only those offsets ought to be considered which arose prior to the entry of the merchandise, is entirely without merit. The offsets are being considered not as relating to, or limited by these particular entries of merchandise, but rather as regards the entire underlying decision that bounties and grants were bestowed, that they represented a certain amount, that they should be allocated in a certain way and that a particular rate of countervailing duty should be applied. The offsets must be considered against the grants not just vis-a-vis a limited segment of production.

Accordingly, we arrive at the final position taken by the defendant and amicus, namely, that plaintiff has failed to prove the offsets it claims.

As was noted earlier these proposed offsets fall into five general categories, transportation, energy, training, storage and taxation.

Transportation is used here to describe first, transportation of the finished product from Nova Scotia to distribution warehouses, second, the transportation to Nova Scotia of raw materials from

suppliers or "tissue" (a semi-finished product) from a Michelin plant in South Carolina, third, the transportation of semi-finished products between the two manufacturing facilities within Nova Scotia and fourth, somewhat more loosely, the travel of personnel between plants. Energy is used here to describe electricity, fuel oil and the related construction of fuel oil storage facilities. Training represents the establishment and conduct of a training school for production and maintenance personnel. Storage represents the maintenance of inventories of raw material supplies. Taxation refers to the sales tax applicable to certain items of equipment and machinery.

Plaintiff conceded the existence of two advantages to the location in Nova Scotia, lower construction costs and lower land costs. It maintained that the wages and salaries in Nova Scotia did not constitute an advantage.

Plaintiff calculated its disadvantages over a twenty year period to correspond with the period over which defendant allocated the grants.

For comparison purposes it discounted all amounts, including the sum of all the grants and bounties, to the value they would have had in 1972.[3] The dollar amount of the disadvantages calculated by plaintiff are as follows:

| Disadvantages | Actual dollar value over 20-year period | 1972 dollar value |
|---|---|---|
| Finished product transportation | $27,498,717 | $12,521,660 |
| Raw Material transportation | 51,028,141 | 16,425,141 |
| Transportation of tissue from U.S. | 21,011,544 | 6,538,283 |
| Interplant transportation | 6,459,757 | 2,175,665 |
| Interplant travel | 1,464,103 | 504,667 |
| Electricity | 37,930,961 | 12,432,859 |
| Fuel | 10,917,776 | 3,589,424 |
| Fuel storage buildings | 685,600 | 685,600 |
| Training | 14,462,895 | 4,775,045 |
| Overstock | 5,470,810 | 1,795,492 |
| Taxation | 498,895 | 498,895 |
| Total disadvantages | $187,429,226 | $61,942,731 |

[3] Plaintiff also made a comparison based on a 1969 date, at which time the surge of energy related costs in the mid-70s would not have been foreseeable. Accordingly, the 1969 figures show a somewhat lower ratio of costs to grants. In addition, the 1969 comparison was made only with grants which could reasonably have been expected in 1972. The Court considers the 1972 comparison to be the only proper one in that it treats all the asserted grants and bounties.

The offset calculation resulting from the deduction of the two advantages conceded by plaintiff is as follows:

|  | Dollar value over 20-year period | 1972 dollar value |
| --- | --- | --- |
| Total disadvantages_____ | $187, 429, 226 | $61, 942, 731 |
| Advantages: |  |  |
|     Construction costs_____ | 5, 110, 379 | 5, 110, 379 |
|     Land costs_____ | 2, 900, 000 | 2, 900, 000 |
|         Total offsets_____ | $179, 418, 847 | $53, 932, 352 |

In sum, plaintiff claims that in 1972 dollar value it would experience cost disadvantages of $53,932,352 as a result of its location in Nova Scotia, an amount which exceeds the total of the grants and bounties found by defendant ($35,747,484) much less the discounted value of those grants and bounties in 1972 ($28,470,933).

The Court's study of the d'Arbonneau report and the related testimony and exhibits reveal serious deficiencies in its calculation of offsets. The deficiencies persuade the Court that the report does not justify the reduction of the bounties and grants by offsets.

In brief, the principal weaknesses of the report are three: First, there was no proof that Michelin Canada paid for the cost of shipping its products to the United States. In fact there is strong evidence to the contrary from the invoices covering the entries in this case which show freight paid and billed to plaintiff. (Record at pp. 856–860) If Michelin Canada were not selling to a related company there might be more appeal to plaintiff's argument that from the point of view of a customer in the midwest of the U.S. paying transportation costs the total cost of a tire from Nova Scotia will have to be higher than from Ontario and this represents a disadvantage to Michelin Canada even though it does not pay the transportation itself. Even then, analysis would require a shift from analyzing production cost disadvantages to analyzing subsequent competitive disadvantages.

Since the measurement of general locational cost disadvantages is already a step beyond the measurement of whether a remitted amount is a *net* bounty, the Court would not enter into analyses of competitive disadvantages after production without the strongest indication in the law that this is a proper consideration in determining the amount of a net bounty.

On the present facts, since the buyer who is paying for the transportation of the tires is a related company and is not a potential

customer for tires of other producers, even those with a lower transportation cost, it may be presumed that the actual disadvantage reveals itself as possibly a higher price when the product is ultimately sold in the United States. The disadvantage does not exist in the transaction between Michelin Canada and plaintiff. This ultimate disadvantage, if it occurs, cannot be transferred back from the plaintiff Michelin U.S. to Michelin Canada. Accordingly, the Court finds it incorrect to calculate a cost disadvantage to Michelin Canada based on the greater cost of transporting its finished product to the United States from Nova Scotia.

The second weakness in the offset calculations, and a devastating one, was the failure to account for an advantage from wages and salaries due to location in Nova Scotia. Defendant's Exhibit W, derived from Statistics Canada,[4] shows that wages in Nova Scotia were 81.3 percent of those in Ontario in 1973.

Unlike its evidence of most of the other cost disadvantages plaintiff's evidence of Michelin Canada's wages and salaries was not drawn directly or retrospectively from Michelin Canada's records. Instead, plaintiff offered a comparison derived from Statistic Canada between wages at five-year intervals in manufacturing industries in Nova Scotia and a *combined* figure for Quebec and Ontario [Exhibit 19, page 22, Table I]. This showed Nova Scotia Wages as 78 percent of wages in Quebec-Ontario in 1971 and 89.9 percent in 1976. This rise was attributed by plaintiff to the settlement of Michelin Canada in Nova Scotia and its assertedly higher wages. In addition, plaintiff claimed that statistics from the Department of Development of Nova Scotia showed that Michelin paid more than 10 percent of the wages of the manufacturing work force of Nova Scotia although it employed less than 8 percent of the workers, meaning that its wages were at least 25 percent higher than the Nova Scotia norm. Finally, plaintiff attributed whatever difference might remain between Nova Scotia wages and those in Ontario to a greater proportion of high wage industries in Ontario, a proposition not demonstrated to the Court's satisfaction,[5] and of dubious importance if proved.

All this was indirect, convoluted and of questionable logical validity. It was no substitute for direct evidence and no match for the more straightforward statistical evidence offered by defendant that in 1973 manufacturing wages in Nova Scotia offered an approximately 19 percent advantage over Ontario [Defendant's Exhibit W]. Plaintiff's use of comparisons between Nova Scotia and Quebec-Ontario is noticeably defective. This went outside the comparison between Nova Scotia and Ontario alone, which had been maintained in other

---

[4] *Statistics Canada* is a publication of the Canadian Government.

[5] Table II on page 23 of Exhibit 19 and the statistics on page 24 were the attempted proof of this proposition

cost comparisons and unjustifiably introduced the effect of relatively lower wage rates in Quebec. It therefore could only understate the true wage differential between Nova Scotia and Ontario.

The statistics from the Department of Development of Nova Scotia showing Michelin Canada to be paying 10 percent of the province's wages to 8 percent of the workers are too skimpy to serve as proof and could be the result of other factors such as overtime wages.

Plaintiff made a strained argument that the wage rates of Michelin Canada could not be compared to those of other tire companies because of different job classifications. But this was not proved and is too important a point to be inferred merely from the opaque indications that Michelin Canada's operations are less reliant on handwork than their competitors.

The testimony of Mr. Ketterling, defendant's expert witness on industrial economics, established to the satisfaction of the Court that Michelin Canada obtained a wage advantage from locating in Nova Scotia and further, that this advantage outweighs all the other disadvantages it may have experienced [Defendant's Exhibits AA–1 and DD–1].

Plaintiff's evidence also was deficient in its accounting for its construction costs and training costs in Nova Scotia. Plaintiff conceded a construction advantage of $5,110,379 in 1972 dollars [Plaintiff's Exhibit 19, pp. 32, 37]. However, plaintiff's figures which again are convoluted and of questionable authority, assumed that construction workers in Nova Scotia were less productive than those in Ontario. This assumption was not proven and when the analysis is made without a reduction for lower productivity, as was done by defendant's witness Mr. Ketterling, the construction savings to Michelin Canada are closer to $11 million. (Record at pp. 1570–1571)

As to training cost plaintiff did not prove that the costs it incurred in Nova Scotia, although greater than in some European countries, were not equivalent to what they would have been in Ontario.

The magnitude of the wage advantage removes whatever disadvantages might have arisen in other cost categories. Obviously, it would not be possible to give plaintiff the benefit of those disadvantages which it did prove while ignoring those factors which outweigh the disadvantages. Nevertheless, for the sake of completeness it should be noted that plaintiff did prove the existence of disadvantages in a number of respects.

The transportation of raw materials from its suppliers and of tissue from Michelin's South Carolina plant were disadvantages of the location in Nova Scotia, as were the costs of maintaining a

greater stock of the raw materials than would have been required in Ontario.

In reaching this conclusion the Court found acceptable the methodology employed by Mr. d'Arbonneau which was essentially to determine the pattern of shipments in 1978 and the comparative shipment costs between the suppliers and Nova Scotia and the suppliers and Toronto. He then calculated the differential for the years 1972 to 1977 taking into account the production during that period and the relevant shipping rates and projected the differentials forward to the twentieth year. The total of $51,028,141 was then discounted back to a 1972 value of $16,425,141.

The Court accepted plaintiff's proof that the receipt of natural rubber shipments in Nova Scotia, which might appear to be an advantage because of the proximity of the port of Halifax, was not an advantage. This resulted from the fact that the containers in which the rubber arrived could not be utilized for a return trip from Halifax due to the lack of departing cargo. Michelin Canada had to incur additional costs to ship the containers overland to Montreal.

The Court also accepted plaintiff's proof that it incurred additional costs in the transportation of semi-finished goods a distance of 150 miles between its two facilities in Nova Scotia. The placing of these facilities so far apart was a direct result of the location in Nova Scotia in that the concentration of the labor force did not permit placing the factories in closer proximity. In Ontario the facilities would have been much closer, if not completely combined.

The Court was also persuaded that Michelin Canada bore additional costs of fuel and electricity in Nova Scotia, compared to the prospect that natural gas would be available and electricity would be cheaper in Ontario.

Overall, however, the existence of a dramatic wage advantage, the unacceptability of plaintiff's proof of disadvantages in the costs of transportation of its finished product, together with its failure to adequately compute the construction advantage and its deficiencies of proof in such lesser items as training, lead to the conclusion that it did not provide a factual basis for finding that the benefits it received were offset by costs arising from its location in Nova Scotia. Although the evidence exceeded the "mere allegations" criticized by the CCPA in the *ASG* opinion it still fell short of proving the facts with reliable and accurate evidence.

This being the case, the determination of the amounts of the bounties and grants remains unchanged except for the required recalculation of the interest bounty. The final issue concerns the allocation of the bounties and grants to production.

## Allocation

The interest bounty was allocated to production in each of the years in which it was received, as was the real estate tax bounty. Plaintiff attempted to relate these bounties to the acquisition of its capital assets and thereby justify allocating them over the useful life of those assets. Although it is true that the loan was for the purpose of constructing production facilities, it is also true that the interest bounty was experienced as an annual benefit and it is therefore not possible to say that its relation to construction ought to be preferred over its effect on Michelin Canada's annual financial condition. The relation of the property tax bounty to capital assets is tenuous and its allocation on an annual basis needs no defense.

A much more complex issue is presented by the allocation of the cash grants, a problem with which the previously discussed new loan agreement of June 1, 1972 is closely connected. The original IEL loan required that such capital grants as Michelin might subsequently receive under the Area Incentives Development Act would be applied to its principal and interest obligations on the loan.

The government allocated the grants over the period of time fixed by the original IEL loan schedule. Since the original schedule was 12 years for 68 percent of the loan and 20 years for 32 percent of the loan, this resulted in $\frac{1}{12}$ of 68 percent of each grant, together with $\frac{1}{20}$ of 32 percent of each grant being allocated to each year and applied against the value of production for that year.

However, the new loan of June 1, 1972 freed Michelin Canada from the compulsory application of the grants to repayment of the original loan. Thus, whatever linkage may have existed between the grants and the loan period ended and, with it, ended the justification which might have existed for allocating the benefit of the grants over the period of the loan.

Plaintiff argues that the proper allocation for a grant given to construct production facilities is over the useful life of the facilities. In this action there was some proof that the useful life of these facilities was at least 40 years and further, that Michelin Canada did not utilize any forms of accelerated depreciation which might warrant finding a shorter life. Plaintiff asserts that its proposed allocation is consistent with general accounting principles.

While as a general proposition it is true that the allocation of funds should take place over the life of the assets they purchase, this principle cannot be automatically applied to bounties or grants on capital assets because of the possibility that benefits may have a disproportionately beneficial effect in the early years. In addition, there are

special considerations in this case which prevent the Court from adopting plaintiff's position.

During the countervailing duty investigation the plaintiff did not disclose the new loan agreement, from which it now seeks to benefit. Although it *was* disclosed in the course of this judicial proceeding the Court finds two reasons for refraining from following the erosion of the justification for defendant's method of allocation to its logical conclusion. First, it would be inequitable to allow plaintiff to benefit at this juncture from conduct which may have partially disabled the defendant from investigating and proving other reasons for allocating the benefits over a period shorter than the useful life of the capital assets. The inequity is compounded when it is considered that the new loan agreement represented a possible additional bounty for which the government cannot obtain an increase of duty in this action. Second, the Court does not find in the record sufficient evidence of the correct period of useful life of the capital assets, which prevents it from reaching a fully informed conclusion if that period of allocation is adopted.

Nevertheless, it is clear that an important basis of defendant's allocation technique has been eliminated and the overall interests of justice require that a correct final determination be made. For this reason the Court considers it proper to remand the question of allocation to the Secretary of Commerce [5] to consider whether any justification exists for allocating the grants to a period shorter than the useful life of the capital assets or to determine the useful life of the assets if no shorter period is justified. In so doing, the Court exercises its power of remand under 28 U.S.C. § 2643 (b) and (c)(1). See, *Carlisle Tire and Rubber Company* v. *United States*, 1 CIT 352, 517 F. Supp. 704, 708-9 (1981).

In its consideration of the allocation question, the Secretary of Commerce shall determine whether or not the benefits of the grants were experienced in earlier periods to a disproportionate extent and shall state the reasons upon which his conclusion is based. If he determines that the life of the capital assets is the proper period of allocation he shall determine that period and state the underlying reasons.

Although the legislative history of the Trade Agreements of 1979 has no direct connection to the interpretation of the law governing this action it nevertheless contains cogent statements regarding the considerations which should govern the allocation of grants for con-

---

[5] The Secretary of Commerce took over the functions of the Secretary of the Treasury involving 19 U.S.C. § 1303 under Reorg. Plan No. 3 of 1979, § 5(a)(1)(C), 44 F.R. 69275, 93 Stat. 1381, eff. Jan. 2, 1980, as provided by section 1-107(a) of Exec. Order No. 12188, January 2, 1980, 45 F.R. 993.

struction or capital equipment. In H. Rep. No. 96–317, 96th Cong., 1st Sess., pp. 74–75, we find the following statement:

> There is, however, a special problem with regard to subsidies which provide an enterprise with capital equipment or a plant. In such cases, the net amount of the subsidy should be amortized over a reasonable period, following the beginning of full scale commercial operation of the equipment or plant, and assessed in relation to the products produced with such equipment or plant during such a period. Furthermore, in calculating the *ad valorem* effect of non-recurring subsidy grants or loans, reasonable methods of allocating the value of such subsidies over the production or exportation of products benefitting from them will be used. Such methods should include relating the benefit of the commercial advantage to the recipient, or relating the value of a subsidy for acquiring assets to their anticipated useful life, based on generally accepted accounting principles.[7]

In a similar vein are the remarks in S. Rep. No. 96–249, 96th Cong., 1st Sess., pp. 85–86:

> There is a special problem in determining the gross subsidy with respect to a product in the case of nonrecurring subsidy grants or loans, such as those which aid an enterprise in acquiring capital equipment or a plant. Reasonable methods of allocating the value of such subsidies over the production or exportation of the products benefitting from the subsidy must be used. In particular, a reasonable period based on the commercial and competitive benefit to the recipient as a result of the subsidy must be used. For example, allocating a subsidy in equal increments over the anticipated 20-year useful life of capital equipment purchased with the aid of the subsidy would not be reasonable if the capital equipment gave the recipient of the subsidy an immediate significant competitive benefit compared to what would be the situation without the capital equipment and compared to the competitive benefit the equipment would likely provide in the later stages of its useful life.

In sum, the Court concludes that the basic determination that these importations benefitted from bounties or grants within the meaning of 19 U.S.C. § 1303 was correct. It concludes however, that the calculation of the bounty resulting from the IEL loan was incorrect and should have been derived from the difference between the loan interest rate of 6 percent and a prevailing rate of 7.56 percent rather than 8 percent. In addition, the Court concludes that the allocation of the grants to the period of the IEL loan was incorrect.

---

[7] The Court notes in passing that the final sentence quoted from the House Report would appear to offer *two* alternative examples and its meaning is made clear if the first appearance of the word "of" in the sentence is changed to "to." The sentence would then read, "Such methods should include relating the benefit *to* the commercial advantage to the recipient, or relating the value of a subsidy for acquiring assets to their anticipated useful life, based on. . . ." This would correct grammatical and textual difficulties in the sentence as it appears in the report.

For the recalculation of the loan interest bounty and for a redetermination of the allocation of the grants the matter is remanded to the Secretary of Commerce. The Secretary is directed to report his determinations to the Court within 120 days of this Order, following which the parties and amicus will have 30 days to file supplemental memoranda.